**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

IN RE FACEBOOK, INC., IPO SECURITIES
AND DERIVATIVE LITIGATION

---

MDL No. 12-2389

ECF Case

This document relates to the
Consolidated Securities Action:

| | |
|---|---|
| NO. 12-CV-4081 | NO. 12-CV-4763 |
| NO. 12-CV-4099 | NO. 12-CV-4777 |
| NO. 12-CV-4131 | NO. 12-CV-5511 |
| NO. 12-CV-4150 | NO. 12-CV-7542 |
| NO. 12-CV-4157 | NO. 12-CV-7543 |
| NO. 12-CV-4184 | NO. 12-CV-7544 |
| NO. 12-CV-4194 | NO. 12-CV-7545 |
| NO. 12-CV-4215 | NO. 12-CV-7546 |
| NO. 12-CV-4252 | NO. 12-CV-7547 |
| NO. 12-CV-4291 | NO. 12-CV-7548 |
| NO. 12-CV-4312 | NO. 12-CV-7550 |
| NO. 12-CV-4332 | NO. 12-CV-7551 |
| NO. 12-CV-4360 | NO. 12-CV-7552 |
| NO. 12-CV-4362 | NO. 12-CV-7586 |
| NO. 12-CV-4551 | NO. 12-CV-7587 |
| NO. 12-CV-4648 | |

**MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS THE**
**CONSOLIDATED CLASS ACTION COMPLAINT**

## TABLE OF CONTENTS

**Page**

INTRODUCTION....................................................................................................1

BACKGROUND ....................................................................................................3
    A.    Facebook's Pre-IPO Public Disclosures. ...........................................3
    B.    Facebook Provides Projections To Its Underwriters. ........................7
    C.    Underwriters Provide Forecasts To Institutional Investors. ..............8
    D.    Facebook Issues a Free Writing Prospectus and Revises Its Internal Projections..............................................................................10
    E.    Facebook Reports Revenue Results Exceeding Its Revised Projections. .............14

ARGUMENT .......................................................................................................16

I.     THE REGISTRATION STATEMENT DOES NOT CONTAIN ANY MISREPRESENTATIONS. ...................................................................16

II.    FACEBOOK DISCLOSED ALL REQUIRED INFORMATION. ...........25
    A.    Facebook Adequately Disclosed the Challenges Posed By Increased Mobile Usage and the Company's Product Decisions...........................26
    B.    Facebook Did Not Have a Duty to Disclose Revenue Projections.......................27
    C.    Facebook Did Not Have a Duty To Disclose Mid-Quarter Revenue Data in Its Registration Statement. ...............33
    D.    The Alleged "Selective Disclosures" Do Not Create Any Duty to Make Additional Disclosures...........................36

III.   FACEBOOK DID NOT OMIT ANY INFORMATION THAT WAS NECESSARY TO PREVENT EXISTING DISCLOSURES FROM BEING MISLEADING. ..........................................................................................39

IV.   ANY OMITTED INFORMATION OR ALLEGEDLY MISLEADING STATEMENTS WERE IMMATERIAL AS A MATTER OF LAW.........................40

V.     PLAINTIFFS CANNOT ESTABLISH LOSS CAUSATION. ...................46

VI.   PLAINTIFFS' SECTION 12 AND 15 CLAIMS FAIL AS A MATTER OF LAW..........................................................................................................51

CONCLUSION ...................................................................................................53

# TABLE OF AUTHORITIES

**Page(s**

**Cases**

*Anserphone of New Orleans, Inc. v. Protocol Commc'ns, Inc.*,
  2002 WL 31741254 (E.D. La. 2002) ..................................................... 36

*Arfa v. Mecox Lane Ltd.*,
  2012 WL 5954124 (2d Cir. 2012) ............................................ 33, 41, 44

*Arfa v. Mecox Lane Ltd.*,
  2012 WL 697155 (S.D.N.Y. 2012), ................................... 33, 34, 35, 52

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
  493 F.3d 87 (2d Cir. 2007) ................................................................... 19

*Barnes v. Osofsky*,
  254 F. Supp. 721 (S.D.N.Y. 1966)
  *aff'd*, 373 F.2d 269 (2d Cir. 1967) ...................................................... 47

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ....................................................................... 42, 45

*Billard v. Rockwell Int'l Corp.*,
  526 F. Supp. 218 (S.D.N.Y. 1981),
  *aff'd*, 683 F.2d 51 (2d Cir. 1982) ......................................................... 29

*Blackmoss Inv. Inc. v. ACA Capital Holdings, Inc.*,
  2010 WL 148617 (S.D.N.Y. 2010) ........................................... 17, 45, 48

*Blum v. Semiconductor Packaging Materials Co.*,
  1998 WL 254035 (E.D. Pa. 1998) ........................................................ 34

*Cerasani v. Sony Corp.*,
  991 F. Supp. 343 (S.D.N.Y. 1998) ....................................................... 21

*City of Omaha, Neb. Civilian Emps.' Ret. Sys. v. CBS Corp.*,
  679 F.3d 64 (2d Cir. 2012) ................................................................... 47

*Condit v. Dunne*,
  317 F. Supp. 2d 344 (S.D.N.Y. 2004) .................................................. 21

*Debora v. WPP Grp. PLC*,
  1994 WL 177291 (S.D.N.Y. 1994) ....................................................... 47

*DeMaria v. Andersen*,
  318 F.3d 170 (2d Cir. 2003) ........................................................... 17, 51

*Dura Pharms., Inc. v. Broudo*,
  544 U.S. 336 (2005) .............................................................................. 50

*Fait v. Regions Fin. Corp.*,
  655 F.3d 105 (2d Cir. 2011) ................................................................. 24

ii

*Freidus v. ING Groep N.V.*,
  736 F. Supp. 2d 816 (S.D.N.Y. 2010) ..................................................... 40

*Garber v. Legg Mason, Inc.*,
  347 F. App'x 665 (2d Cir. 2009) ........................................................... 42

*Geiger v. Solomon-Page Group, Ltd.*,
  933 F.Supp. 1180 (S.D.N.Y. 1996) ....................................................... 45

*Glassman v. Computervision Corp.*,
  90 F.3d 617 (1st Cir. 1996) ........................................................... passim

*Glazer v. Formica Corp.*,
  964 F.2d 149 (2d Cir. 1992) ................................................................ 25

*Grossman v. Novell, Inc.*,
  120 F.3d 1112 (10th Cir. 1997) ........................................................... 31

*Halperin v. eBanker USA.com, Inc.*,
  295 F.3d 352 (2d Cir. 2002) ................................................................ 24

*I. Meyer Pincus & Assocs. v. Oppenheimer & Co., P.C.*,
  936 F.2d 759 (2d Cir. 1991) ................................................................ 41

*In re Agria Corp. Secs. Litig.*,
  672 F. Supp. 2d 520 (S.D.N.Y. 2009) ................................................... 51

*In re Alliance Pharm. Corp. Secs. Litig.*,
  279 F. Supp. 2d 171 (S.D.N.Y. 2003) ................................................... 52

*In re Am. Int'l Group, Inc., 2008 Secs. Litig.*,
  2013 WL 1787567 (S.D.N.Y. 2013) ..................................................... 23

*In re Britannia Bulk Secs. Litig.*,
  665 F. Supp. 2d 404 (S.D.N.Y. 2009) ..................................... 42, 46, 50

*In re Burlington Coat Factory Secs. Litig.*,
  114 F.3d 1410 (3d Cir. 1997) ......................................................... 28, 29

*In re Canandaigua Secs. Litig.*,
  944 F. Supp. 1202 (S.D.N.Y. 1996) ................................................. 26, 27

*In re Convergent Techs. Secs. Litig.*,
  948 F.2d 507 (9th Cir. 1991) ......................................................... 31, 40

*In re Cosi, Inc. Secs. Litig.*,
  379 F. Supp. 2d 580 (S.D.N.Y. 2005) ................................................... 51

*In re Duane Reade Inc. Secs. Litig.*,
  2003 WL 22801416 (S.D.N.Y. 2003)
  *aff'd*, 107 F. App'x 250 (2d Cir. 2004) ................................................ 24

*In re Facebook, Inc., IPO Secs. & Deriv. Litig.*,
  2013 WL 525158 (S.D.N.Y. 2013) .................................................. passim

*In re Focus Media Holding Ltd. Litig.*,
  701 F. Supp. 2d 534 (S.D.N.Y. 2010) ............................................. passim

*In re Gen. Elec. Co. Secs. Litig.*,
  856 F. Supp. 2d 645 (S.D.N.Y. 2012) ........................................................ 24

*In re Gen. Elec. Co. Secs. Litig.*,
  857 F. Supp. 2d 367 (S.D.N.Y. 2012) ........................................................ 24

*In re IAC/InterActiveCorp Secs. Litig.*,
  695 F. Supp. 2d 109 (S.D.N.Y. 2010) ................................................... 19, 23

*In re IndyMac Mortgage-Backed Secs. Litig.*,
  718 F. Supp. 2d 495 (S.D.N.Y. 2010) ........................................................ 49

*In re Ivan F. Boesky Sec. Litig*,
  825 F. Supp. 623 (S.D.N.Y. 1993) ............................................................ 30

*In re Leapfrog Enters., Inc. Secs. Litig.*,
  527 F. Supp. 2d 1033 (N.D. Cal. 2007) ...................................................... 16

*In re Lyondell Petrochemical Co. Secs. Litig.*,
  984 F.2d 1050 (9th Cir. 1993) ......................................................... passim

*In re Manulife Fin. Corp. Secs. Litig.*,
  2012 WL 4108104 (S.D.N.Y. 2012) .......................................................... 47

*In re Morgan Stanley Info. Fund Secs. Litig.*,
  592 F.3d 347 (2d Cir. 2010) ........................................................... passim

*In re Morgan Stanley Tech. Fund Secs. Litig.*,
  643 F. Supp. 2d 366 (S.D.N.Y. 2009) ........................................................ 25

*In re N. Telecom Ltd. Secs. Litig.*,
  116 F. Supp. 2d 446 (S.D.N.Y. 2000) ........................................................ 28

*In re N2K, Inc. Sec. Litig.*,
  82 F. Supp. 2d 204 (S.D.N.Y. 2000) ......................................................... 35

*In re Noah Educ. Holdings, Ltd. Secs. Litig.*,
  2010 WL 1372709 (S.D.N.Y. 2010) ............................................. 16, 17, 26, 33

*In re Omnicom Group, Inc. Secs. Litig.*,
  597 F.3d 501 (2d Cir. 2010) .............................................................. 47, 49

*In re Salesforce.com Secs. Litig.*,
  2005 WL 6327481 (N.D. Cal. 2005) .......................................................... 28

*In re Smart Techs., Inc. S'holder Litig.*,
  2013 WL 139559 (S.D.N.Y. 2013) ............................................................ 47

*In re Time Warner Inc. Secs. Litig.*,
  9 F.3d 259 (2d Cir. 1993) .................................................................. 25

*In re Turkcell Iletisim Hizmetler A.S. Secs. Litig.*,
  202 F. Supp. 2d 8 (S.D.N.Y. 2001) ................................................... 33, 35, 43

*In re United Brands Co. Sec. Litig.*,
  1988 WL 67413 (S.D.N.Y. 1988) ............................................................. 31

iv

*In re Veeco Instruments Inc. Secs. Litig.*,
2007 WL 4115809 (S.D.N.Y. 2007) ............................................................ 47

*In re Worlds of Wonder Secs. Litig.*,
35 F.3d 1407 (9th Cir. 1994) ...................................................... 32, 34, 35, 40

*Iowa Pub. Emps' Ret. Sys. v. MF Global, Ltd.*,
620 F.3d 137 (2d Cir. 2010) .......................................................... 24, 45, 46

*J & R Mktg. v. General Motors Corp.*,
549 F.3d 384 (6th Cir. 2008) ...................................................................... 38

*Janbay v. Canadian Solar, Inc.*,
2013 WL 1287326 (S.D.N.Y. 2013) ........................................................... 46

*Johnson v. Sequans Commc'ns S.A.*,
2013 WL 214297 (S.D.N.Y. 2013) .................................................. 23, 24, 51

*Krim v. BancTexas Group, Inc.*,
989 F.2d 1435 (5th Cir. 1993) .................................................................... 28

*Lasker v. N.Y. State Elec. & Gas Corp.*,
85 F.3d 55 (2d Cir. 1996) ........................................................................... 51

*Lin v. Interactive Brokers Group, Inc.*,
574 F. Supp. 2d 408 (S.D.N.Y. 2008) ........................................................ 45

*Meyer v. Greene*,
710 F.3d 1189 (11th Cir. 2013) .................................................................. 48

*Mo. Portland Cement Co. v. Cargill, Inc.*,
498 F.2d 851 (2d Cir. 1974) ....................................................................... 23

*N.J. Carpenters Health Fund v. Royal Bank of Scotland Group*,
709 F.3d 109 (2d Cir. 2013) .................................................................. 23, 45

*NECA-IBEW Pension Trust Fund v. Bank of Am. Corp.*,
2012 WL 3191860 (S.D.N.Y. 2012) ........................................................... 24

*Olkey v. Hyperion 1999 Term Trust, Inc.*,
98 F.3d 2 (2d Cir. 1996) ....................................................................... 17, 41

*Portannese v. Donna Karan Int'l, Inc.*,
1998 WL 637547 (E.D.N.Y. 1998) ............................................................. 28

*Rubke v. Capitol Bancorp Ltd*,
551 F.3d 1156 (9th Cir. 2009) ........................................................ 22, 28, 29

*Schoenhaut v. Am. Sensors, Inc.*,
986 F. Supp. 785 (S.D.N.Y. 1997) ....................................................... 34, 35

*Shemian v. Research In Motion Ltd.*,
2013 WL 1285779 (S.D.N.Y. 2013) ........................................................... 49

*Sheppard v. TCW/DW Term Trust 2000*,
938 F. Supp. 171 (S.D.N.Y. 1996) ....................................................... 28, 29

*Solow v. Citigroup, Inc.*,
  2012 WL 1813277 (S.D.N.Y. 2012)
  *aff'd*, 2013 WL 149902 (2d Cir. 2013) .................................................................. 22

*Steckman v. Hart Brewing, Inc.*,
  1996 WL 881659 (S.D. Cal. 1996)
  *aff'd*, 143 F.3d 1293 (9th Cir. 1998) .................................................................... 32

*Truk Int'l Fund LP v. Wehlmann*,
  737 F. Supp. 2d 611 (N.D. Tex. 2009)
  *aff'd*, 389 F. App'x 354 (5th Cir. 2010) ................................................................ 44

*TSC Indus., Inc. v. Northway, Inc.*,
  426 U.S. 438 (1976) ..................................................................................... 41, 45

*Wielgos v. Commonwealth Edison Co.*,
  892 F.2d 509 (7th Cir. 1989) .............................................................................. 31

*Zucker v. Quasha*,
  891 F. Supp. 1010 (D.N.J. 1995),
  *aff'd,* 82 F.3d 408 (3d Cir. 1996) ....................................................................... 34

**Statutes**

15 U.S.C. § 77k(a) ......................................................................................... 16, 25

15 U.S.C. § 77*l*(a)(2) ........................................................................................ 16

15 U.S.C. § 77o .............................................................................................. 16

15 U.S.C. § 78u-5(c) ........................................................................................ 31

**Regulations and Administrative Guidance**

17 C.F.R. § 210.3–12(a) ..................................................................................... 34

17 C.F.R. § 229.10 ........................................................................................... 26

17 C.F.R. § 229.10(b)(1) .................................................................................... 29

17 C.F.R. § 229.303(a)(3)(i) ............................................................................... 28

17 C.F.R. § 229.303(a)(3)(ii) .......................................................................... 26, 28

17 C.F.R. § 230.408(a) ...................................................................................... 40

17 C.F.R. § 243.100(a) ...................................................................................... 37

*Certain Investment Company Disclosures*,
  54 Fed. Reg. 22427 (May 18, 1989) ................................................................. 27, 29

*Disclosure of Projections of Future Economic Performance*,
  38 Fed. Reg. 7220 (Feb. 2, 1973) ......................................................................... 38

*Disclosure to Investors: A Reappraisal of the
  Federal Administrative Policies Under the '33 and '34 Acts* (1969) ............................... 37

*Guidance Regarding Prohibited Conduct in Connection with IPO Allocations*,
   SEC Release No. 33-8565, 2005 WL 1641394 (Apr. 7, 2005)....................................... 9

*Guides for Disclosure of Projections of Future Economic Performance*,
   43 Fed. Reg. 53246 (Nov. 15, 1978)...................................................................... 30

*Proposed Guides for Disclosure of Projections of Future Economic Performance*,
   41 Fed. Reg. 19986 (Apr. 23, 1976)...................................................................... 38

*Safe Harbor For Forward-Looking Statements*,
   59 Fed. Reg. 52723 (Oct. 19, 1994) ................................................................ 30, 31

*Securities Offering Reform*,
   70 Fed. Reg. 44722 (Aug. 3, 2005) .................................................................. passim

*Selective Disclosure and Insider Trading*,
   65 Fed. Reg. 51716 (Aug. 24, 2000) ...................................................................... 38

## Other Authorities

Heller, Harry, *Disclosure Requirements Under Federal Securities Regulation*,
   16 Bus. Law. 300 (1961)...................................................................................... 49

Hurt, Christine, *Moral Hazard and the Initial Public Offering*,
   26 Cardozo L. Rev. 711 (2005)............................................................................ 49

Johnson, Jr., Charles J. & McLaughlin, Joseph,
   *Corporate Finance and the Securities Laws* § 3.04[A][6] (4th ed. 2012 Supp.) .............. passim

Mann, Bruce Alan, *Prospectuses: Unreadable or Just Unread?—*
   *A Proposal to Reexamine Policies Against Permitting Projections*,
   40 Geo. Wash. L. Rev. 222 (1971)........................................................................ 49

McLaughlin, Joseph, *Integrated Disclosure, Shelf Registration, and Other Due Diligence*
   *Challenges in the Public Offering Process*, 886 Practising Law Institute 721 (1995) ............ 49

*Report of the Advisory Committee on Corporate Disclosure to the SEC*,
   95th Cong., (Comm. Print. 1977)......................................................................... 37

Ripkin, Susanna Kim, *Predictions, Projections, and Precautions*,
   2005 U. Ill. L. Rev. 929..................................................................................... 31

Schultheis, Patrick J. *et al.*, *The Initial Public Offering:*
   *A Guidebook For Executives & Boards of Directors* (Bowne 2d ed.) ....................................... 8

Westenberg, David A., *Initial Public Offerings:*
   *A Practical Guide to Going Public* § 19:7.2[B] (PLI Sept. 2011) ............................................ 7

## INTRODUCTION

Plaintiffs have had over nine months to reassess their claims in light of their "independent investigation" into the stock decline following Facebook's IPO.  Compl. ¶ 2.  Yet, they do no better than claim that Facebook misled investors by warning that increased mobile usage and product decisions "<u>may</u> negatively affect our revenue" because this supposedly implied that these factors "<u>had</u>" not already "negatively impacted [Facebook's] revenue."  *Id.* ¶ 11 (emphasis added in Complaint).  But these "may" statements simply warned of potential harm to ***future*** revenue and financial results; there is no plausible basis to claim that this somehow misled the public about what already was known and disclosed about the increase in mobile usage and about product decisions.  In particular, as this Court noted, Facebook "repeatedly made express and extensive warnings … about the trend of increased use of mobile applications."  *In re Facebook, Inc., IPO Secs. & Deriv. Litig.*, 2013 WL 525158, at *19 (S.D.N.Y. 2013) ("Derivative Op.").  And Facebook disclosed that "some of this mobile usage ***has been and will continue to be*** a substitute for use of Facebook through personal computers."  Final S-1, at 51 (emphasis added).  Such increased mobile use was affecting revenue growth to the extent that users were accessing Facebook on their mobile devices as a substitute for Facebook on their personal computers (PCs).  This was because, as Facebook explained, the company has "historically not shown ads to users accessing Facebook through mobile apps," and did "not currently directly generate any meaningful revenue from the use of Facebook mobile products."  *Id.* at 14.  Facebook further disclosed that increased mobile usage, along with certain product decisions, had caused an ongoing decrease in the number of ads delivered per user—a trend with obvious implications for revenue growth.  *Id.* at 57.  Given this context, Facebook's additional, accurate "may" warnings were in no way misleading.

What Plaintiffs apparently seek is Facebook's ***quantification*** of how the company thought increased mobile usage and product decisions might affect future revenue growth.  Thus, Plaintiffs complain that Facebook "failed to disclose that … as a result of these trends, [the company] had decreased its ***expected*** revenue for the second quarter of 2012," and for the entire year.  Compl. ¶ 201 (emphasis added).  By "expected revenue," of course, Plaintiffs mean "revenue projections."   But the SEC and courts throughout the country "have uniformly agreed that internal calculations and projections" need not be disclosed before an IPO.  Derivative Op. at *23 (internal quotation omitted).  The reason for this rule—that revenue projections are inherently speculative and unreliable—is illustrated by the facts of this case.  The revised projections which Plaintiffs claim should have been disclosed turned out to be too conservative; Facebook's actual results ***exceeded*** even its original projections (which were also not publicly disclosed).

Plaintiffs nonetheless insist that Facebook's projections must be "highly material" because the company provided this information to its underwriters' analysts.  Compl. ¶ 177.  But even if one were to accept that dubious supposition, "[a] material omission … is actionable only if the omitted facts were … required by SEC regulations to be stated in the relevant communication."  *In re Focus Media Holding Ltd. Litig.*, 701 F. Supp. 2d 534, 539 (S.D.N.Y. 2010).  And the SEC has consistently refused to require issuers to disclose to the public all "material nonpublic information" that they share with investment professionals prior to an IPO, because such a rule would "adversely affect the capital formation process."  70 Fed. Reg. 44722, 44760 (Aug. 3, 2005).  Plaintiffs would have this Court impose—retroactively—a rule which the SEC has for decades thoughtfully rejected.  This Court should decline the invitation.

## BACKGROUND

Facebook operates an online social networking service that allows users to connect and share information with friends and family.  Since its founding in 2004, Facebook has attracted over one billion users.  Its mission is "to make the world more open and connected."  Final S-1, at 1.[1]  In order to raise capital to continue this mission, and to compensate the employees and investors who staked their careers and livelihoods on the company, Facebook went public in 2012.  *Id.* at 37, 82.

### A.    Facebook's Pre-IPO Public Disclosures.

In preparation for its IPO, Facebook filed its initial registration statement on Form S-1 on February 1, 2012.  The Registration Statement contained a great deal of historical data about Facebook's performance and a description of risks associated with investing in the company.  One such risk that was disclosed was that the company "prioritizes user engagement over short-term financial results," and thus "frequently make[s] product decisions that may reduce our short-term revenue."  *Id.* at 17.  Facebook's CEO Mark Zuckerberg explained to potential investors that the company's strategy has always been to prioritize the user experience, often at the expense of short-term revenue considerations.  *See id.* at 81-82 ("Simply put: we don't build services to make money; we make money to build better services.").

---

[1]  Unless otherwise noted, we use "Registration Statement" or "Final S-1" to refer to the final Registration Statement, which became effective on May 17, 2012 and incorporated by reference the final prospectus, which was filed with the SEC on May 18, 2012.  All of Facebook's SEC filings are available at www.sec.gov/cgi-bin/browse-edgar?company=Facebook&match=&CIK=&filenum=&State=&Country=&SIC=&owner=exclude&Find=Find+Companies&action=getcompany.  The Final S-1 is attached to the Declaration of Andrew B. Clubok ("Clubok Decl.") as Exhibit A.  The May 9, 2012 Free Writing Prospectus (Ex. G) and excerpts of prior drafts of the S-1 (Exs. B-D, H) are also attached to the Clubok Declaration.  The alleged misstatements or omissions upon which Plaintiffs base their claims are contained in, or were allegedly omitted from, these publicly filed documents.  Compl. ¶¶ 34, 186-202, 217, 238-41.

The Registration Statement provided an example of this long-term approach when it outlined the company's response to the increased use of Facebook on mobile devices.  Prior to the IPO, the company perceived that users were increasingly accessing Facebook through mobile devices, sometimes as a substitute for doing so on personal computers.  Because Facebook—at the time—did not display ads on mobile devices, or generate any meaningful revenue from such devices, this trend had obvious implications for Facebook's short-term revenue growth.  The Registration Statement disclosed this mobile risk no fewer than **nine** times.  In a preliminary section entitled "Summary Risk Factors," Facebook highlighted up front "[s]ome of the[] risks" facing the company.  Final S-1, at 5; *accord* S-1, Feb. 1, 2012, at 5 (attached as Clubok Decl. Ex. B).  In the third bullet (right after warning that the loss of users or the loss of advertisers could impact revenues), Facebook made clear that "Growth in use of Facebook through our mobile products, where our ability to monetize is unproven, as a substitute for use on personal computers may negatively affect our revenue and financial results."  *Id.*  Facebook repeated this warning throughout its Registration Statement, from the very first draft filed:

- Our advertising revenue could be adversely affected by a number of other factors, including: … ***increased user access to and engagement with Facebook through our mobile products, where we do not currently directly generate meaningful revenue***, particularly to the extent that mobile engagement is substituted for engagement with Facebook on personal computers where we monetize usage by displaying ads and other commercial content.  S-1, Feb. 1, 2012*, at 12 (emphasis added); *accord* Final S-1, at 13.

- We had more than 425 million MAUs[2] who used Facebook mobile products in December 2011. ***We anticipate that the rate of growth in mobile users will continue to exceed the growth rate of our overall MAUs for the foreseeable future,*** in part due to our focus on developing mobile products to encourage mobile usage of Facebook. Although the

---

[2]   Facebook measures its users in terms of monthly active users (MAUs) and daily active users (DAUs).  A "monthly active user" is defined as "a registered Facebook user who logged in and visited Facebook through [the] website or a mobile device … in the last 30 days as of the date of measurement."  Final S-1, at 48.  A "daily active user" is defined as "a registered Facebook user who logged in and visited Facebook through [the] website or a mobile device … on a given day."  *Id.* at 49.

substantial majority of our mobile users also access and engage with Facebook on personal computers where we display advertising, our users could decide to increasingly access our products primarily through mobile devices. ***We do not currently directly generate any meaningful revenue from the use of Facebook mobile products***, and our ability to do so successfully is unproven. Accordingly, if users continue to increasingly access Facebook mobile products as a substitute for access through personal computers, and if we are unable to successfully implement monetization strategies for our mobile users, our revenue and financial results may be negatively affected.  S-1, Feb. 1, 2012, at 13 (emphasis added); *accord* Final S-1, at 14.

- We believe that our ability to compete effectively depends upon … our ability to successfully monetize mobile usage.  S-1, Feb. 1, 2012, at 14; *accord* Final S-1, at 15-16.

- We do not currently display ads to users who access Facebook via mobile apps or our mobile website. … We believe that people around the world will continue to increase their use of Facebook from mobile devices, and that some of this mobile usage ***has been and will continue to be*** a substitute for use of Facebook through personal computers.  S-1, Feb. 1, 2012, at 46 (emphasis added); *accord* Final S-1, at 51.

- We currently do not show ads or directly generate any meaningful revenue from users accessing Facebook through our mobile products ….  S-1, Feb. 1, 2012, at 79; *accord* Final S-1 at 93.

- We believe that mobile usage of Facebook is critical to maintaining user growth and engagement over the long term, and ***we are actively seeking to grow mobile usage, although such usage does not currently directly generate any meaningful revenue***.  S-1, Feb. 1, 2012, at 81 (emphasis added); *accord* Final S-1, at 94.

In subsequent drafts of its Registration Statement, Facebook made further disclosures that responded to the SEC's request for more specific information about increased mobile usage and disclosed newly-acquired information about the ongoing mobile usage trend, including completed first quarter financial results:

- *Increasing Mobile Usage*. ***Increasing use of Facebook on mobile devices <u>will</u> also affect our performance,*** particularly if mobile use substitutes for use on personal computers. Historically, we have not shown ads to users accessing Facebook through mobile apps or our mobile website and we cannot be certain that our mobile monetization approaches will be successful in generating meaningful revenue. We cannot quantify the extent to which mobile usage of Facebook is substituting for, rather than incremental to, usage of Facebook through personal computers, but we generally expect mobile usage to increase at a faster rate than usage through personal computers for the foreseeable future. *See* S-1, Mar. 7, 2012, at 51 (attached as Clubok Decl. Ex. C) (emphasis added); *accord* Final S-1, at 53.

- We had 432 million MAUs who used Facebook mobile products in December 2011. While most of our mobile users also access Facebook through personal computers, we

anticipate that the rate of growth in mobile usage will exceed the growth in usage through personal computers for the foreseeable future …. [W]e do not currently directly generate any meaningful revenue from the use of Facebook mobile products, and our ability to do so successfully is unproven. Accordingly, if users increasingly access Facebook mobile products as a substitute for access through personal computers, and if we are unable to successfully implement monetization strategies for our mobile users, or if we incur excessive expenses in this effort, our financial performance and ability to grow revenue ***would*** be negatively affected. S-1, Mar. 7, 2012, at 14 (emphasis added); *accord* Final S-1, at 14.

- We had 488 million MAUs who used Facebook mobile products in March 2012. While most of our mobile users also access Facebook through personal computers, we anticipate that the rate of growth in mobile usage will exceed the growth in usage through personal computers for the foreseeable future, …. [W]e do not currently directly generate any meaningful revenue from the use of Facebook mobile products, and our ability to do so successfully is unproven. S-1, April 23, 2012, at 14 (attached as Clubok Decl. Ex. D); *see also* Final S-1, at 14 (adding additional disclosure based on information from the second quarter that "We believe this increased usage of Facebook on mobile devices has contributed to the recent trend of our daily active users (DAUs) increasing more rapidly than the increase in the number of ads delivered").

Despite the fact that Facebook did not yet generate meaningful revenue from mobile usage, Facebook made clear in its disclosures that any efforts to monetize mobile usage would be "balance[d] … with our commitment to optimizing the user experience."  Final S-1, at 95.  The company further emphasized that it was presently attempting ***to increase*** mobile usage—a strategy that in the short term was continuing the trend of user growth outpacing growth in ad delivery.  *See id.* at 50, 57.

The Registration Statement also disclosed that the astronomical rate of revenue growth, which the company experienced in its early years, may be unsustainable.  *See* Final S-1, at 1, 19, 43 (186% revenue growth between 2008 and 2009).  The company explained that, even as its revenue continued to grow, its *rate* of revenue growth had been slowing for years, *see id.* at 19 ("[O]ur revenue grew 154% from 2009 to 2010, 88% from 2010 to 2011, and 45% from the first quarter of 2011 to the same period in 2012."); *cf. id.* at 60 ("Our net income in the first quarter of

2012 decreased compared to the same period in 2011."), and was likely to continue to slow: "*We expect our rates of growth will decline in the future*," *id.* at 19 (emphasis in original).

### B. Facebook Provides Projections To Its Underwriters.

Like every company, Facebook makes revenue projections for internal purposes. Before engaging in an IPO, companies typically provide this information to their underwriters. *See* David A. Westenberg, *Initial Public Offerings: A Practical Guide to Going Public* § 19:7.2[B] (PLI Sept. 2011) (noting that proper IPO preparation includes "discussions with management concerning the company's financial model" so analysts can "develop earnings forecasts"). Underwriters combine this information with their own models in order to develop their own forecasts of the company's future revenue and to facilitate price discovery. *See* Charles J. Johnson, Jr. & Joseph McLaughlin, *Corporate Finance and the Securities Laws* § 3.04[A][6] (4th ed. 2012 Supp.) (noting that disclosure of revenue projections to underwriters "serve[s] the valid corporate purpose[] of assisting in the price discovery process").

Plaintiffs allege that, consistent with industry practice, prior to the IPO, Facebook disclosed its revenue projections to analysts employed by its underwriters, a group the Complaint dubs "the Syndicate Analysts." Compl. ¶ 6. According to Plaintiffs, Facebook executives met with the underwriters on April 16, 2012, in order to provide them with information about the company, including its revenue projections for the second quarter of 2012 and the full year. *Id.* ¶¶ 6, 106. At that time, "Facebook's internal revenue estimate for the second quarter, which had begun on April 1, ranged from $1.1 to $1.2 billion," and its "internal revenue estimate for the 2012 fiscal year was $5 billion." *Id.* ¶ 107. Notably, Plaintiffs do not allege that Facebook disclosed these projections to the general public or that it was required to do so.

According to Plaintiffs, the underwriters' analysts combined Facebook's internal projections with their own research to develop their own forecasts of Facebook's future revenue. *Id.* ¶ 108.  Each underwriter's forecasts were different.  Goldman Sachs, for instance, predicted that Facebook would take in $1.207 billion in the second quarter and $5.169 billion for the year. *Id.*  Bank of America, by contrast, foresaw $1.166 billion for the second quarter and $5.040 billion for the year.  *Id.*  Forecasts from J.P. Morgan (2Q: $1.182 billion; 2012: $5.044 billion) and Morgan Stanley (2Q: $1.175 billion; 2012: $5.036 billion) fell in between. *Id.*

### C.    Underwriters Provide Forecasts To Institutional Investors.

Beginning on May 7, 2012, Facebook made a number of presentations to potential institutional investors at events known as "road shows."  Compl. ¶ 103.  The road show is "one of the most important parts of the IPO process," because it allows the issuer and the underwriters to "market[] the IPO directly to institutional investors."  *Id.*; *see also* Patrick J. Schultheis *et al.*, *The Initial Public Offering: A Guidebook For Executives & Boards of Directors* 183 (Bowne 2d ed.) ("[R]oad shows today play an integral part of the IPO process.  The primary purpose of the road show is to sell the offering shares to institutional investors.").  Plaintiffs allege that, in this same period, each underwriter provided its own analyst's predictions of Facebook's future revenue to certain large institutional investors.  Compl. ¶ 137.[3]  Again, underwriters typically provide such forecasts to their clients as part of the IPO process.  *See, e.g.*, Johnson & McLaughlin, *supra* § 3.04[A][6] (noting the typical practice of "lead underwriter[s] orally

---

[3]    Plaintiffs do not allege that the underwriters shared *Facebook's* internal projections with the institutional investors, or anyone else.  *See, e.g.*, Compl. ¶ 137 ("[T]he Syndicate Analysts made a series of private phone calls to these select investors to inform them …[that] ***these analysts*** had … cut[] ***their*** revenue estimates for the Company ….") (emphasis added).

providing estimates to institutional investors"); Letter from Darrell Issa, Chair, House Comm. on Oversight & Gov't Reform, to Hon. Mary L. Schapiro, Chair, SEC, at 1 (June 19, 2012) (noting that underwriters' provision of forecasts to clients was "consistent with the law") (attached as Clubok Decl. Ex. E).[4]   Underwriters use these conversations to gauge institutional investor interest for the issuer's securities and engage in price discovery.  *See* Guidance Regarding Prohibited Conduct in Connection with IPO Allocations, SEC Release No. 33-8565, 2005 WL 1641394, at *5 (Apr. 7, 2005) (noting that, during the pre-IPO "book-building process," underwriters gather "information from investors that will assist them in determining particular investors' interest in the company, assessing demand for the offering, and improving pricing accuracy for the offering"); Johnson & McLaughlin, *supra* § 3.04[A][6] (noting that underwriters must provide forecasts to institutional investors in order to receive estimates of those investors' intended purchases because "institutional investors … cannot make an intelligent decision on valuation unless they are supplied with earnings estimates").

---

[4]   *See also* Henry Blodget, *EXCLUSIVE: Here's The Inside Story of What Happened on the Facebook IPO*, Bus. Insider, May 22, 2012 (explaining that it is "industry convention" in IPOs that:  (1) future revenue "estimates are usually developed through close collaboration between the underwriters' research analysts and company management"; (2) "These estimates are conveyed verbally to institutional investors who are considering investing in the IPO"; and (3) "Importantly, these estimates are not published anywhere"); Kayla Tausche & Jesse Bergman, *What Ignited the Facebook-Analyst Fallout?*, CNBC.COM, May 24, 2012 (analysts can "be privy to selective financial information regarding earnings guidance in order to begin building models with full-year forecasts" and are "typically" permitted to orally "disclose this information to potential IPO investors"); Evelyn Rusli, *et al.*, *Questions of Fair Play Arise in Facebook's IPO Process*, N.Y. TIMES, May 23, 2012 ("As is typical in the I.P.O. process, research analysts at Morgan Stanley, Goldman Sachs and other firms contacted certain clients to discuss their revised expectations, while other big investors called on the banks to get their new take.").  All news articles cited in this memorandum are collected in Exhibit F to the Declaration of Andrew B. Clubok.

**D.    Facebook Issues a Free Writing Prospectus and Revises Its Internal Projections.**

On May 9, 2012, Facebook issued a Free Writing Prospectus (FWP) that disclosed to the securities markets that the previously-disclosed trend of a decline in the number of ads delivered per user had continued into the second quarter because of increased mobile usage and certain product decisions:

- Based upon our experience in the second quarter of 2012 to date, *the trend we saw in the first quarter of DAUs increasing more rapidly than the increase in number of ads delivered has continued*. We believe this trend is driven in part by increased usage of Facebook on mobile devices where we have only recently begun showing an immaterial number of sponsored stories in News Feed, and in part due to certain pages having fewer ads per page as a result of product decisions.

Facebook's FWP, May 9, 2012 (emphasis added) (attached as Clubok Decl. Ex. G).  That same day, Facebook added this same disclosure to the section of the Registration Statement entitled "Management's Discussion and Analysis of Financial Condition and Results of Operation," specifically, to the discussion of Facebook's revenue results for the first quarter of 2012.  *See* S-1, May 9, 2012, at 57 (attached as Clubok Decl. Ex. H).  This discussion also referred the reader to the Registration Statement's previous disclosures regarding increased mobile usage.  *Id.*

Numerous media outlets reported on this disclosure.  The *Financial Times*, for instance, noted that "Facebook said the migration of its users to mobile platforms *is compromising its ability to make money* from them."  April Dembosky, *Facebook Admits To Mobile Weakness*, Fin. Times, May 9, 2012 (emphasis added).[5]  *Business Insider* added that Facebook's filing

---

[5]    Numerous other outlets made similar reports on after Facebook issued its Free Writing Prospectus.  *See, e.g.*, *Facebook warns potential investors that mobile is an even bigger risk than originally disclosed*, Wash. Post, May 10, 2012 (Facebook "amended its prospectus to warn potential investors *that mobile is an even bigger risk than originally disclosed* ... The revised mobile warning seems especially pertinent after Facebook reported a disappointing first quarter") (emphasis modified); Keith Teare, *Mobile: Facebook and Google Can't Live With It and They Can't Live Without It*, TechCrunch, May 12, 2012 ("[T]he street' has picked

revealed that the company "is unlikely to be able to generate as much revenue per user from mobile as it does from the web," and that this concern, combined with the fact that "Facebook's growth is decelerating," make the offering "muppet bait."  Henry Blodget, *Facebook Is "Muppet Bait,"* Bus. Insider, May 10, 2012 (adding that the disclosure that Facebook "is willing to sacrifice short-term performance to build [its] long-term mission" is a "three-alarm klaxon warning short-term investors away from the stock").  The publication *PrivCo* went as far as to say that Facebook's May 9 Free Writing Prospectus "reveals fast erosion in [its] core advertising business," offers "a stunning preview of a ***lower than expected Q2 as a result of the shift to mobile devices***," and "***Effectively Warns Investors That Facebook Will Miss Its Second-Quarter Projections***."  *Facebook Admits Mobile Shift Damaging Business Faster Than Expected In New SEC Filing; Will Miss Q2 Projections*, PRIVCO, May 9, 2012 (emphasis added).  These same publications noted that, in addition to increased mobile usage, the company's product decisions were also partially responsible for the ongoing reduction in ads delivered per user.  *See, e.g.*, *id.* (noting Facebook's product decision disclosures); Dembosky, *supra* (reporting that Facebook attributed the reduction in ads per user in part "to certain product decisions that have

---

up on the fact that the rate of revenue growth ***is declining as traffic migrates to mobile***.") (emphasis added); Somini Sengupta, *Facebook's Prospects May Rest on Trove of Data*, N.Y. Times, May 14, 2012 ("[Facebook] warned in a revision to its offering documents … that the mobile shift meant it was adding users faster than it was increasing the number of ads it displayed."); Paul Sloan, *Facebook Amends IPO Filing: Mobile a Growing Problem*, CNET, May 9, 2012 ("Facebook today amended its S-1 filing with the SEC to emphasize how the shift of its users to mobile devices *is hurting* what it can charge for ads, threatening its long-term revenue.  Facebook has already highlighted that it so far has no way to monetize its growing number of mobile users, and today's additions to the document emphasize that issue.") (emphasis added); *Facebook Gives More Details on Mobile Usage*, Associated Press, May 9, 2012 ("Facebook says it saw [a decrease in ads delivered per user] in the first quarter, and that *has continued* in the current quarter.") (emphasis added); Nick Bilton, *Facebook Says, Lower Your Expectations About Mobile*, N.Y. Times, May 9, 2012; Shayndi Raice, *Facebook Reveals Vulnerability in Mobile*, Wall St. J., May 10, 2012.

reduced the number of ads per page shown to users on desktop computers"); Teare, *supra* (stating that Facebook's disclosure that its product decisions were reducing ads per user made it unmistakably clear that, for Facebook, "Product takes priority over revenue").

Beginning the night of May 9 and continuing the next day, Plaintiffs allege that Facebook's Treasurer phoned the underwriters' analysts who had received Facebook's initial projections on April 16 to "make sure [they] saw the disclosure [Facebook] made in [its] amended filing," Compl. ¶ 133, and to inform them that Facebook had revised its internal revenue projections, albeit still within the range originally projected for the second quarter, *see id.* ¶¶ 132-34 (second quarter 2012 projection revised to "low end" of the original range of $1.1-$1.2 billion and full year 2012 projection reduced by 3-3.5% (original projection of $5 billion)). According to Plaintiffs, this was done to ensure that the underwriters' analysts, in calculating their own forecasts, did not rely on the internal projections Facebook shared in April. *Id.* ¶¶ 125-26; *see also* Johnson & McLaughlin, *supra* § 3.04[A][6] ("Having received earlier estimates, the institutional customers should of course receive any updated estimates.").   During these conversations, Facebook's Treasurer purportedly told each underwriter, in sum and substance:

> The upshot of this [disclosure] is that we believe we are going to come in [on] the lower end of our $1.1 to $1.2 bn range for Q2 *based upon the trends we described in the disclosure*. A lot of investors have been focused on whether the trend of ad impressions per user declining (primarily as a result of mobile) was a one-time, or continuing, occurrence. *As you can see from our disclosure, the trend is continuing*. You can decide what you want to do with your estimates, *our long term conviction is unchanged*, but in the near term we see these trends continuing, hence our being at the low end of the $1,100-$1,200 range.

Compl. ¶ 133 (emphasis modified); *id.* ¶ 134 ("through the rest of the year, [Facebook] could be 3 to 3 and a half percent off the 2012 $5 billion [revenue] target.").

Facebook's reduction in its revenue projections—and its communication of that reduction to analysts—was reported in the press *before the IPO*.  *Bloomberg*, for instance, reported on

12

May 11 that Facebook was "telling analysts that sales may not meet their most optimistic projections."  Serena Saitto, *et al.*, *Facebook IPO Said to Get Weaker-Than Forecast Demand*, Bloomberg (May 11, 2012).  Several other major news outlets picked up this story and similarly reported that Facebook had lowered its revenue projections.  *See, e.g.*, Henry Blodget, *UH OH: Facebook IPO Seeing 'Weak Demand,'* Bus. Insider, May 10, 2012 (Facebook is "said to have told investors that it won't meet their most optimistic projections."); *Facebook IPO: 'Expectations on Facebook are way too high*, Wash. Post, May 11, 2012 (same); Kim Peterson, *Is Facebook IPO Hot or Not?*, MSN Money, May 11, 2012 (same); Cory Willard, *Is the J.P. Morgan bombshell a one-day event?*, Wall St. J. MarketWatch, May 11, 2012 (linking to the Bloomberg article as one that "every investor should be thinking about into this weekend").  In total, this news was reported in at least 16 media sources.[6]

Each underwriter subsequently updated its own revenue forecasts.  Compl. ¶ 136.[7] Again, the underwriters' forecasts differed based on their views of Facebook's prospects.  *Id.*

---

[6]   *See also* Emil Protalinski, *Facebook IPO Demand is Strong and Weak (Rumors)*, ZDNet, May 10, 2012; Douglas MacMillan, *et al.*, *Facebook CEO Focuses on Mobile Strategy as IPO Nears*, Bloomberg, May 14, 2012; *Street Snub for Facebook*, N.Y. Post, May 11, 2012; *Facebook IPO Demand Said Weaker Than Expected*, Newsmax, May 10, 2012; Jim Kim, *Assessing Demand for Facebook Shares*, FierceFinance, May 14, 2012; Juliette Garside, *Facebook IPO Overvalued at $96bn, Say Investors*, The Guardian, May 11, 2012 (U.K.); Serena Saitto, *et al.*, *Institutions Unfriendly to Facebook*, Montreal Gazette, May 12, 2012; Douglas MacMillan, *et al.*, *Facebook's Mobile Shortcomings Loom Over Thursday IPO*, Toronto Star, May 14, 2012; Serena Saitto, *et al.*, *Not Many Likes for Facebook IPO*, Calgary Herald, May 11, 2012; *Is Facebook Really Worth $96bn?*, Sunday Bus. Post, May 13, 2012 (Ireland); *Facebook Offering Seeing Lower Than Expected Demand: Reports*, Domain-b, May 14, 2012 (India).

[7]   Several analysts outside of the IPO syndicate also lowered their forecasts of Facebook's future revenue based solely on the May 9 Amendment.  *See, e.g.*, Steven Russolillo, *Facebook Bull Shows Cautious Side*, Wall St. J. MarketBeat, May 11, 2012 (reporting that Ken Sena, a tech analyst at Evercore Partners, "[r]educ[ed] his valuation range by $10 billion … [and] cut his full-year revenue estimate by 6%, 'given the company's comments around the potential for near term impact from accelerated mobile transition'").  And numerous media outlets soon

Bank of America, for instance, forecasted that Facebook would generate $4.815 billion in revenue in 2012 (a number below the range Facebook provided), whereas Morgan Stanley and Goldman Sachs put Facebook's 2012 revenue at $4.854 and $4.852 billion, respectively (both of which were above the range Facebook provided). *Id.* The underwriters then informed certain institutional investors of their revised revenue forecasts. Compl. ¶ 137. This too is a textbook example of industry practice:

> Following the Facebook IPO in 2012, the financial press criticized the underwriters for providing reduced estimates to institutional customers but not retail customers. The criticism is baseless since the 'clearing price' for the IPO will be established on the basis of what the institutional customers are willing to pay for the IPO shares. Having received earlier estimates, the institutional customers should of course receive any updated estimates. Since retail investors do not participate in the price discovery process, they do not need to receive estimates (or, by definition, any updated estimates).

Johnson & McLaughlin, *supra* § 3.04[A][6].

### E.    Facebook Reports Revenue Results Exceeding Its Revised Projections.

Facebook's revised projections turned out to be too conservative; the original projections were closer, although even the original projection for annual revenues proved too *low*. As disclosed in Facebook's second quarter filing last summer and its more recent annual filing, Facebook took in $1.184 billion in revenue in the second quarter of 2012, and $5.089 billion for

---

reported that the offering was "generat[ing] lower-than-expected demand from institutional investors who are concerned about the company's growth prospects." *E.g.,* Serena Saitto, *et al.*, *Facebook IPO Said to Get Weaker-Than-Forecast Demand*, Bloomberg (May 10, 2012); *see also Facebook IPO: 'Expectations on Facebook are way too high*, Wash. Post, May 11, 2012; Cody Willard, *Is the J.P. Morgan bombshell a one-day event?*, Wall St. J. MarketWatch, May 11, 2012; *Street Snub for Facebook*, N.Y. Post, May 11, 2012; Douglas MacMillan *et al.*, *Facebook CEO Focuses on Mobile Strategy as IPO Nears*, Bloomberg Businessweek, May 14, 2012; Emil Protalinski, *Facebook IPO Demand is Strong and Weak (Rumors)*, ZDNet, May 10, 2012; Kim Peterson, *Is Facebook IPO Hot or Not?*, MSN Money, May 11, 2012; Henry Blodget, *UH OH: Facebook IPO Seeing 'Weak Demand,'* Bus. Insider, May 10, 2012.

the full year.  *See* Facebook's Form 10-Q Disclosure ("10-Q, Q2 2012"), July 31, 2012, at 5

(attached as Clubok Decl. Ex. I); Facebook's Form 10-K Disclosure, February 1, 2013 ("10-K,

2012"), at 34 (attached as Clubok Decl. Ex. J).  The annual revenues ***exceeded*** both Facebook's

original projection of $5 billion and its revised projection of $4.825 to $4.85 billion.   And

Facebook's actual second quarter revenues came in at the ***high*** end of its original $1.1 to

$1.2 billion range, rather than at the low end, as it had advised its underwriters in the updated

guidance.    Ironically, the best predictor of Facebook's future revenue was Thomson's

Institutional Brokers' Estimate System ("Thomson's")—a group that, according to Plaintiffs,

represents the "consensus estimates" of "analysts who had ***not*** been told of the decline in

Facebook's estimated revenues."   Compl. ¶ 182 (emphasis added).   At the time of the IPO,

Thomson's revenue forecast for Facebook was $1.2 billion for the second quarter and $5 billion

for the year. *Id.*

### Revenue Projections for Second Quarter 2012

| **Predictor** | **April 2012 Projection** | **May 2012 Projection** | **Actual Revenue** |
|---|---|---|---|
| Facebook (internal) | $1.1-$1.2 billion | "lower end" of 1.1-1.2 bn | $1.184 billion |
| Goldman Sachs | $1.207 billion | $1.125 billion | $1.184 billion |
| J.P. Morgan | $1.182 billion | $1.096 billion | $1.184 billion |
| Morgan Stanley | $1.175 billion | $1.111 billion | $1.184 billion |
| Bank of America | $1.166 billion | $1.100 billion | $1.184 billion |
| Thomson's | N/A | $1.2 billion | $1.184 billion |

### Revenue Projections for Full Year 2012

| **Predictor** | **April 2012 Projection** | **May 2012 Projection** | **Actual Revenue** |
|---|---|---|---|
| Facebook (internal) | $5 billion | $4.825-$4.85 billion | $5.089 billion |
| Goldman Sachs | $5.169 billion | $4.852 billion | $5.089 billion |
| J.P. Morgan | $5.044 billion | $4.839 billion | $5.089 billion |
| Morgan Stanley | $5.036 billion | $4.854 billion | $5.089 billion |
| Bank of America | $5.040 billion | $4.815 billion | $5.089 billion |
| Thomson's | N/A | $5 billion | $5.089 billion |

**ARGUMENT**

Section 11 of the Securities Act imposes liability for registration statements that "contain[] an untrue statement of a material fact or omit[] to state a material fact required to be stated therein or necessary to make the statements therein not misleading."  15 U.S.C. § 77k(a).  Similarly, Section 12 imposes liability on "[a]ny person who ... offers or sells a security ... by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements … not misleading."  15 U.S.C. § 77*l*(a)(2).  Section 15 of the Securities Act makes a "control person" liable for causing violations of Sections 11 and 12.  15 U.S.C. § 77o.

"Collectively, the language of [S]ections 11 and 12(a)(2) creates three potential bases for liability … (1) a misrepresentation; (2) an omission in contravention of an affirmative legal disclosure obligation; and (3) an omission of information that is necessary to prevent existing disclosures from being misleading."  *In re Morgan Stanley Info. Fund Secs. Litig.*, 592 F.3d 347, 360 (2d Cir. 2010).  Where such a misrepresentation or omission is identified, the court must then determine whether it is material. *See id.*  Here, Plaintiffs have not adequately alleged any of the three bases for liability identified above.  Moreover, even if Plaintiffs had identified such a misrepresentation or omission, it would be immaterial as a matter of law given the extensive disclosures and cautionary language contained in the Registration Statement, and in light of Plaintiffs' inability to show loss causation.  Accordingly, the Complaint should be dismissed.

## I.  THE REGISTRATION STATEMENT DOES NOT CONTAIN ANY MISREPRESENTATIONS.

In an effort to make this case about something other than omitted projections, Plaintiffs cherry pick several cautionary warnings in the Registration Statement and argue that Facebook misled investors because these statements warned that increased mobile usage and product

16

decisions "<u>may</u> negatively affect our revenue" when, in fact, these factors supposedly already "<u>had</u> negatively impacted [Facebook's] revenue." Compl. ¶ 11 (emphasis added in Complaint); *see also id.* ¶¶ 188-96. But a warning that increased mobile usage "may" harm future revenue does not tell investors, as Plaintiffs would have it, that increased mobile usage had not *already* affected revenue growth. *See, e.g.*, *In re Noah Educ. Holdings, Ltd. Secs. Litig.*, 2010 WL 1372709, at *7-8 (S.D.N.Y. 2010) ("[T]he lengthy, forward-looking recitation of risks facing [Defendant] did not imply that none of these risks … would affect [Defendant's] most recent fiscal quarter."); *In re Leapfrog Enters., Inc. Secs. Litig.*, 527 F. Supp. 2d 1033, 1048 (N.D. Cal. 2007) (rejecting claim that "defendants should have stated that the adverse factors 'are' affecting financial results rather than 'may' affect financial results"). To the contrary, such a statement must be read in "context." *In re Noah Educ. Holdings*, 2010 WL 1372709, at *7; *see also Olkey v. Hyperion 1999 Term Trust, Inc.*, 98 F.3d 2, 5 (2d Cir. 1996) ("[P]rospectuses must be read as a whole.") (internal quotations omitted). And far from "bur[ying]" the effect of increased mobile usage or "treat[ing] [it] cavalierly," *Olkey*, 98 F.3d at 5, Facebook's Registration Statement made abundantly clear that increased mobile use was affecting revenue growth to the extent users were substituting mobile use for use on their PCs, because Facebook did not at that time generate any meaningful revenue from mobile usage. Accordingly, Plaintiffs' attempts to read "may" in isolation must fail. *See Blackmoss Inv. Inc. v. ACA Capital Holdings, Inc.*, 2010 WL 148617, at *7-8 (S.D.N.Y. 2010) (Sweet, J.) (prospectus not misleading where it disclosed the information that was allegedly withheld); *DeMaria v. Andersen*, 318 F.3d 170, 181-82 (2d Cir. 2003) (holding that prospectus was not misleading where cautionary statements disclosed that results of operations "may" fall below expectations and prospectus also disclosed an expectation of substantial future losses).

The "may" statements about which Plaintiffs complain were directed to the potential effect of mobile usage on future revenue. Indeed, the warnings were identified as forward-looking statements, and appeared in a section entitled "Risk Factors." *See* Final S-1, at 35 (noting that the Registration Statement's use of the word "may" is "intended to identify forward-looking statements"). The "may" statements also did not say mobile usage had not *already* had an impact. Rather, the entirety of the paragraph in which the statement Plaintiffs highlight appears made clear that mobile usage was already affecting revenue growth:

> ***Growth in use of Facebook through our mobile products, where our ability to monetize is unproven, as a substitute for use on personal computers may negatively affect our revenue and financial results.*** We *had* 488 million MAUs who used Facebook mobile products in March 2012. While most of our mobile users also access Facebook through personal computers, we anticipate that the rate of growth in mobile usage will exceed the growth in usage through personal computers for the foreseeable future, in part due to our focus on developing mobile products to encourage mobile usage of Facebook. **We have historically not shown ads to users accessing Facebook through mobile apps or our mobile website.** In March 2012, we began to include sponsored stories in users' mobile News Feeds. However, **we do not currently directly generate any meaningful revenue from the use of Facebook mobile products, and our ability to do so successfully is unproven. We believe this increased usage of Facebook on mobile devices has contributed to the recent trend of our daily active users (DAUs) increasing more rapidly than the increase in the number of ads delivered**. If users increasingly access Facebook mobile products as a substitute for access through personal computers, and if we are unable to successfully implement monetization strategies for our mobile users, or if we incur excessive expenses in this effort, our financial performance and ability to grow revenue would be negatively affected.

Final S-1, at 14 (quoted in Compl. ¶ 189) (latter emphasis added). This paragraph thus disclosed that Facebook's "ability to grow revenue ***would*** be negatively affected" by increased mobile usage ***if*** two conditions were met: (1) "users increasingly access Facebook mobile products as a substitute for access through personal computers," and (2) the company is "unable to successfully implement monetization strategies for our mobile users," or incurs "excessive expenses in this effort." *Id.* (emphasis added). Read in context, it was evident that mobile usage

18

was *currently* having a negative effect on revenue because Facebook *also* disclosed that those two conditions were *currently* occurring. *See id.* at 51 ("some of this mobile use has been, and will continue to be, a substitute for use of Facebook through personal computers"); *id.* at 14 ("we do not currently generate any meaningful revenue from the use of mobile products").[8] Facebook correctly used the word "may," however, in discussing potential future harm, because such harm would not occur if one of the two conditions ceased. For instance, mobile usage would not harm the company's revenue growth if it were able to monetize such usage. Facebook's caution in using the word "may" is proving more and more prescient given that the company reported over $400 million in revenue from its mobile monetization efforts in 2012.[9]

Likewise, Facebook properly explained that it used "may" about product decisions because although such decisions "may reduce our short-term revenue," Facebook believed that such decisions would benefit "user experience and will thereby improve our financial performance over the long term." *Id.* at 17. But Facebook warned: "These decisions may not produce the long-term benefits that we expect …." *Id.*

---

[8] That these disclosures referenced currently occurring and continuing trends is underscored by the fact that Facebook repeated them in each of the ten iterations of its Registration Statement filed from February 1, 2012 to May 18, 2012. *See supra* Background, Section A.

[9] *See* 2012 10-K, at 41 (disclosing that "[i]n 2012, we began showing ads in mobile users' News Feeds, and for the fourth quarter of 2012 and for the year ended December 31, 2012, we estimate that approximately 23% and 11% of our ads revenue came from mobile products, respectively"). The Court may take judicial notice of "legally required public disclosure documents filed with the SEC," *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007), including such documents filed after the offering, *see In re IAC/InterActiveCorp*, 695 F. Supp. 2d 109, 121 (S.D.N.Y. 2010) ("[T]he company's SEC filings reveal that the travel division enjoyed steady growth throughout 2004. Plaintiffs call defendants' allusion to these strong results 'engaging in inappropriate factual disputation.' But there is no question that the Court may consider public SEC filings on this motion.") (internal citations omitted).

Outside of the "Risk Factors" section, the Registration Statement provided even more information about mobile usage and product decisions and their current effect on revenue growth.  The Registration Statement disclosed that mobile usage had increased rapidly, *see id.* at 50 ("In all regions, an increasing number of our MAUs *are* accessing Facebook through mobile devices.") (emphasis added); *id.* at 88 ("We *had* 488 million MAUs who used Facebook mobile products in March 2012, and we *surpassed* 500 million mobile MAUs as of April 20, 2012.") (emphasis added); *id.* at 51 ("Worldwide mobile MAUs increased by 69% from 288 million as of March 31, 2011 to 488 million as of March 31, 2012."); *id.* at 50 (chart showing increase in mobile MAUs), and that "some of this mobile usage *has been and will continue to be a substitute* for use of Facebook through personal computers," *id.* at 51 (emphasis added).  That some users were substituting use of Facebook on devices with limited ads (mobile), for use of Facebook on devices with ads (PCs), had obvious revenue implications given that Facebook also disclosed that its advertising revenue, which accounts for "substantially all" of its revenue, *id.* at 54, depends, in part, on the number of users to whom it is able to deliver advertisements, *see id.* at 52 ("Growth trends in MAUs, DAUs, and mobile MAUs are critical variables that affect our revenue and financial results by influencing the number of ads we are able to show …."); *id.* at 18 ("Our financial results … can be influenced by … the number of ads shown to our users").

In its May 9 Free Writing Prospectus, Facebook emphasized that increasing mobile usage, along with certain product decisions,[10] was responsible for another ongoing trend that was

---

[10]   Facebook also highlighted the current effects of its product decisions in other parts of its Registration Statement.  *See* Final S-1, at 17 ("[W]e believe that the recent trend of our DAUs increasing more rapidly than the increase in the number of ads delivered *has been due* in part to certain pages having fewer ads per page as a result of these kinds of product decisions.") (emphasis added); *see also id.* at 61 ("various product changes *implemented in 2011* . . . modestly *reduced* the number  of ads on certain pages") (emphasis added).

currently affecting revenue: "Based upon our experience in the second quarter of 2012 to date, the trend we saw in the first quarter of DAUs increasing more rapidly than the increase in number of ads delivered **has continued**.  We believe that this trend **is driven** in part by increased usage of Facebook on mobile devices … and in part due to certain pages having fewer ads as a result of product decisions."  Facebook's May 9, 2012 FWP; *accord* Final S-1, at 57 (emphasis added).  Again, for a company that generates "substantially all" of its revenue from delivering ads to users, an ongoing decrease in the amount of ads delivered per user necessarily affects revenue.  Indeed, various media outlets reported that Facebook had disclosed this very impact.  *See, e.g.*, Dembosky, *supra* ("Facebook said the **migration** of its users to mobile platforms **is compromising its ability to make money** from them.") (emphasis added); Russolillo, *supra* ("But in a filing on Wednesday, Facebook … said ad revenue isn't keeping up with user growth."); *see also* Blodget, *UH OH*, *supra* ("Apparently investors are nervous about the company's decelerating growth, especially relative to the company's user growth (as they should be)."); *supra* note 5 and accompanying text (collecting news reports).[11]

Despite this, Plaintiffs insist that the May 9 disclosure that ads delivered per user was decreasing was "too vague" to suggest a current impact on revenue growth to "normal investors."  Compl. ¶ 181.  But this conclusory allegation is undermined not only by the widespread media coverage of the disclosure, but also by other allegations which demonstrate that Plaintiffs clearly understood the obvious:  a reduction in ads delivered per user affects the company's revenue growth.  *See id.* ¶ 21 ("the prospectus did say … that users are growing faster

---

[11]  This Court may take judicial notice of media reports that show a matter was the subject of "widespread publicity."  *Condit v. Dunne*, 317 F. Supp. 2d 344, 358 (S.D.N.Y. 2004); *see also Cerasani v. Sony Corp.*, 991 F. Supp. 343, 354 n.3 (S.D.N.Y. 1998) (taking judicial notice of "widespread newspaper coverage").

*than revenue*") (emphasis added) (internal quotations omitted); *id.* ¶ 91 (admitting that the Registration Statement disclosed "that Facebook's business model depends almost entirely on selling advertisements to companies that want to reach Facebook's user base").

If Facebook's specific disclosures seemed "too vague" to Plaintiffs, it is because the company preferred accuracy to uncertain quantification.  The company expressly informed investors that it was unable to "quantify the extent to which mobile usage of Facebook is substituting for, rather than incremental to, usage of Facebook through personal computers," Final S-1, at 53, and this made it difficult to "more specifically assess the impact of increasing mobile use on its revenue," Facebook's Response to SEC Staff Comments, Mar. 7, 2012, at 5 (attached as Clubok Decl. Ex. K) (cited in Compl. ¶ 102).  Notably, Plaintiffs do *not* challenge Facebook on this score—nowhere in the Complaint do they allege that Facebook should have quantified the impact of mobile on revenues *already reported from completed quarters*.  Nor could they.  Facebook provided potential investors with accurate narrative disclosures as well as data relevant to the question; most notably, the Registration Statement disclosed that "approximately 83 million mobile MAUs accessed Facebook solely through mobile apps or our mobile website during the month ended March 31, 2012, and we believe that mobile-only users increased relative to the same period in the prior year." Final S-1, at 50.  But the extent to which mobile usage substituted for personal computer usage for "[t]he remaining 405 million mobile MAUs" who "accessed Facebook from both personal computers and mobile devices during that month," was unknown and perhaps unknowable.  *Id.*  Without that information, Facebook could not know with the certainty necessary for inclusion in a registration statement the precise extent to which increasing mobile usage had harmed revenues in the past, and it certainly could not know how much it was affecting revenues from the not yet completed second quarter.

Plaintiffs nevertheless complain that Facebook should have warned that its "business had suddenly weakened," or that it had suffered a "pronounced revenue deterioration." Compl. ¶¶ 16, 21 (internal quotations omitted). As this Court has recognized, a company need not characterize its business—just six and half weeks into the second quarter—in such pejorative terms. *See, e.g.*, *Solow v. Citigroup, Inc.*, 2012 WL 1813277, at *4 (S.D.N.Y. 2012) (issuer "was not obligated to characterize its performance … in negative terms … or paint [itself] in the most unflattering light possible.") (Sweet, J.), *aff'd*, 2013 WL 149902 (2d Cir. 2013); *Rubke v. Capitol Bancorp Ltd*, 551 F.3d 1156, 1163 (9th Cir. 2009) (rejecting claim that "merely squabble[d] about the adverbs used in the registration statement"); *see also Mo. Portland Cement Co. v. Cargill, Inc.*, 498 F.2d 851, 873 (2d Cir. 1974) ("Courts should tread lightly in imposing a duty of self-flagellation"). Nor should the Court accept Plaintiffs' hyperbolic characterizations of Facebook's business, because Plaintiffs have not pled any facts which plausibly support these extravagant characterizations. *See N.J. Carpenters Health Fund v. Royal Bank of Scotland Group*, 709 F.3d 109, 127-28 (2d Cir. 2013) (conclusory allegations about an issuer's business are not assumed true on a motion to dismiss). The inference that the company's business had suddenly collapsed is belied by the updated projections themselves, which predicted second quarter revenues *within* the initially projected $1.1 to $1.2 billion range and annual revenues between $4.825 and $4.85 billion, a minor decrease from $5 billion. And as noted above, Facebook's actual results hit the high end of its original projected range for the second quarter, and surpassed its original full-year projection. *See, e.g.*, *Johnson v. Sequans Commc'ns S.A.*, 2013 WL 214297, at *12 (S.D.N.Y. 2013) (concluding that "Plaintiffs' allegations do not give rise to a plausible inference that the WiMAX industry was in steep decline at the time of the IPO," given "the unchallenged fact that Sequans actually experienced record sales in the two

quarters following the IPO"); *In re IAC/InterActiveCorp Secs. Litig.*, 695 F. Supp. 2d at 121 ("[P]laintiffs have been unable to explain why IAC's travel division performed so well in 2003 and 2004 if, as they say, the travel division was reeling from dissatisfied customers …").

Finally, Plaintiffs' reliance on Facebook's "may" statements fails because statements of what "may" happen are merely "opinions" about the future, which are generally not actionable under the securities laws because they are normally incapable of being "false." *See In re Am. Int'l Group, Inc., 2008 Secs. Litig.*, 2013 WL 1787567, at *4 (S.D.N.Y. 2013) ("By repeatedly disclaiming fraud …, Plaintiffs have disavowed any allegation that the Defendants knowingly misstated any opinions they may have implicitly or explicitly communicated in the offering documents and SEC filings."); *In re Gen. Elec. Co. Secs. Litig.*, 857 F. Supp. 2d 367, 403 (S.D.N.Y. 2012) (statement that "our board *may* reduce or eliminate our common stock dividend" was a non-actionable opinion "since plaintiff had disclaimed scienter as a basis of its Securities Act claims") (emphasis added); *In re Duane Reade Inc. Secs. Litig.*, 2003 WL 22801416, at *7 (S.D.N.Y. 2003) ("forward-looking predictions" are "opinions"), *aff'd*, 107 F. App'x 250 (2d Cir. 2004).  Opinions can only give rise to Section 11 liability as falsehoods, if the speaker does not actually believe them.  *See In re Gen. Elec.*, 856 F. Supp. 2d at 653 ("[S]tatements of belief or opinion may give rise to liability under Sections 11 and 12" only if they were "'both objectively false and disbelieved ... at the time it was expressed.'") (quoting *Fait v. Regions Fin. Corp.*, 655 F.3d 105, 110 (2d Cir. 2011)).  Plaintiffs cannot make that showing here because they expressly disclaim any allegations of fraud, scienter, and recklessness, and because, as noted, Facebook's "may" warnings were completely accurate. Compl. ¶¶ 3, 11; *see also NECA-IBEW Pension Trust Fund v. Bank of Am. Corp.*, 2012 WL 3191860, at *12 n.19 (S.D.N.Y. 2012) (dismissing 1933 Act claims challenging opinions where

"plaintiffs expressly disclaim[ed] any allegations ... that defendants acted with intentionally fraudulent or reckless misconduct"); *In re Gen. Elec. Co.*, 856 F. Supp. 2d at 657 (same).[12]

## II.    FACEBOOK DISCLOSED ALL REQUIRED INFORMATION.

Section 11 liability can also be premised on "an omission in contravention of an affirmative legal disclosure obligation."   *In re Morgan Stanley*, 592 F.3d at 360.   But, importantly, Section 11 does not create an affirmative obligation to disclose all material facts; rather, it only imposes liability for registration statements that "omit[] to state a material fact *required to be stated therein*."   15 U.S.C. § 77k(a) (emphasis added).   This means that "a corporation is not required to disclose a fact merely because a reasonable investor would very much like to know that fact.   Rather, an omission is actionable under the securities laws *only when the corporation is subject to a duty to disclose the omitted facts*."   *In re Time Warner Inc. Secs. Litig.*, 9 F.3d 259, 267 (2d Cir. 1993) (emphasis added); *see also Glazer v. Formica Corp.*, 964 F.2d 149, 156 (2d Cir. 1992) ("Even if information is material, there is no liability … unless there is a duty to disclose it.") (internal quotations omitted); *In re Morgan Stanley Tech. Fund Secs. Litig.*, 643 F. Supp. 2d 366, 375 (S.D.N.Y. 2009), *aff'd*, 592 F.3d 347 (2d Cir. 2010) ("[I]t is well established that there is no liability in the absence of a duty to disclose, even if the information would have been material.").

---

[12] The extensive disclosures that Facebook's revenue would be negatively affected also mean that any "may" statements cannot give rise to liability under the bespeaks-caution doctrine, which holds that "'[a] forward-looking statement accompanied by sufficient cautionary language is not actionable because no reasonable investor could have found the statement materially misleading.   In such circumstances, it cannot be supposed by a reasonable investor that the future is settled, or unattended by contingency.'"   *Johnson*, 2013 WL 214297, at *9) (quoting *Iowa Pub. Emps' Ret. Sys. v. MF Global, Ltd.*, 620 F.3d 137, 141 (2d Cir. 2010)); *see also Halperin v. eBanker USA.com, Inc.*, 295 F.3d 352, 357 (2d Cir. 2002) ("Certain alleged misrepresentations in a stock offering are immaterial as a matter of law … in light of adequate cautionary language set out in the same offering.").

Here, Facebook fulfilled all possible disclosure obligations related to increased mobile usage and the company's product decisions.  *See supra* Section I.   Nevertheless, Plaintiffs complain that Facebook did not disclose revenue projections and mid-quarter data, which, they claim, would have further elucidated the effect of these factors.  Compl. ¶¶ 188(c)-(e), 201.  This claim fails because courts and the SEC have made abundantly clear that a company does not have a duty to disclose such information.

### A.    Facebook Adequately Disclosed the Challenges Posed By Increased Mobile Usage and the Company's Product Decisions.

SEC regulations prescribe precisely what information is "required to be stated" in a registration statement.  *See Focus Media*, 701 F. Supp. 2d at 539; *see also In re Noah Educ. Holdings*, 2010 WL 1372709, at *7 (noting that there are "carefully delineated SEC regulations that specify what financial data must be disclosed in offering documents").   For instance, an issuer must describe its business, financial results and capital structure, as well as the key risks facing the company.  *See* Regulation S-K, 17 C.F.R. § 229.10 *et seq.*   An issuer must also provide an analysis of the company's results of operations and financial condition.  *Id.*   As relevant here, issuers are required to "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."   Regulation S-K, Item 303, 17 C.F.R. § 229.303(a)(3)(ii).  This means that an issuer must provide a "narrative explanation" of its reported financial data.  *In re Canandaigua Secs. Litig.*, 944 F. Supp. 1202, 1210 (S.D.N.Y. 1996) ("[T]he S.E.C. portrays the role of [Item] 303 as filling the 'need for a narrative explanation of financial statements.'") (quoting *Certain Investment Company Disclosures*, 54 Fed. Reg. 22427, 22428 (May 18, 1989)); *see also In re Noah Educ. Holdings*, 2010 WL 1372709, at *6 ("The Second Circuit has noted that the aim of Item 303 is to *explain*

irregularities in offering documents and prevent a company's last reported financial results from misleading potential investors.") (emphasis added).

Facebook satisfied any Item 303 duty it may have had as to mobile by providing a thorough narrative explanation of the mobile trend.  As this Court previously ruled, Facebook "repeatedly made *express and extensive* warnings in the Company's Registration Statement, drafts of the Registration Statement and in its final Offering Documents about the *trend* of increased use of mobile applications."  Derivative Op. at *19 (emphasis added).  And as discussed *supra* Section I, Facebook's Registration Statement disclosed the "known" trend of "DAUs increasing more rapidly than the increase in number of ads delivered," which it attributed to increased mobile usage and certain product decisions.  Final S-1, at 57.[13]  Moreover, the company further disclosed that "increasing use of Facebook on mobile devices *will* also affect our performance, particularly if mobile use substitutes for use on personal computers," *id.* at 53 (emphasis added), and that "people around the world will continue to increase their mobile usage of Facebook, and … some of this mobile usage *has been and will continue to be* a substitute for use of Facebook through personal computers," *id.* at 51 (emphasis added).

### B.     Facebook Did Not Have a Duty to Disclose Revenue Projections.

Plaintiffs insist that Item 303 requires more.  They argue that a company must disclose not only "any known trends" that "the registrant reasonably expects will have a material …

---

[13]  Contrary to Plaintiffs' assertion (Compl. ¶ 200), Facebook's product strategies are not "a 'trend or uncertainty' obligating disclosure in the market and to competitors" under Item 303. *In re Canandaigua Secs. Litig.*, 944 F. Supp. at 1210-11 ("There is a significant difference between events and trends affecting 'operations,' such as the closure of a plant or the increase in costs of raw materials, and competitive marketing strategies and plans.  The former are information concerning the extrinsic operational situation that management faces, and needs to be disclosed, while the latter are competitive business judgments that management makes to improve the business, and need not be disclosed" under Item 303).  Nevertheless, they were disclosed. *See supra* pp. 19-21.

impact on net sales or revenues," 17 C.F.R. § 229.303(a)(3)(ii), but also "the extent of any such

impact on revenue," Compl. ¶ 197 (emphasis in Complaint); *see also* ¶ 188(c).  Thus, Plaintiffs

assert that "in violation of Item 303, the Registration Statement … failed to disclose that," as a

result of "the known trends of increasing mobile usage and the Company's product decisions …

Facebook had decreased its expected revenue for the second quarter of 2012 by as much as

8.33%," and "had decreased its expected revenue for the year by as much as 3.5%."  *Id.* ¶ 201.

But Item 303 requires no such thing.[14]  As this Court has recognized, "[t]he federal

securities laws do not obligate companies to disclose their internal forecasts."  *In re N. Telecom*

*Ltd. Secs. Litig.*, 116 F. Supp. 2d 446, 458 (S.D.N.Y. 2000) (internal quotations omitted); *see*

*also* Derivative Op. at *23 ("Courts throughout the country have uniformly agreed that 'internal

calculations and projections are not material facts that are required to be disclosed' in a

registration statement.") (quoting *Sheppard v. TCW/DW Term Trust 2000*, 938 F. Supp. 171,

177-78 (S.D.N.Y. 1996)).  Every court to consider the question has agreed.[15]  Moreover, courts

---

[14]  Plaintiffs misleadingly allege that Item 303 "specifically requires disclosure of … the extent
of any such impact on revenue."  Compl. ¶ 197 (emphasis in Complaint); *see also id.* ¶¶
188(c), 201.  That is not what Item 303 requires.  Indeed, in contrast to the provision of Item
303 that is relevant here—*i.e.*, subsection (a)(3)(ii), which requires the disclosure of "known
trends" reasonably expected to have a material impact on net revenues, 17 C.F.R.
§ 229.303(a)(3)(ii)—a separate subsection of Item 303 does require the disclosure of "the
extent to which [reported] income *was* … [materially] affected" by "unusual or infrequent
events or transactions," *id.* 17 C.F.R. § 229.303(a)(3)(i).  Notably subsection (a)(3)(i) requires
the disclosure of the magnitude of the impact of such rare events in the context of *past*
*reported* income.  Subsection (a)(3)(ii) does not purport to impose a requirement to disclose
the projected extent of an impact of an existing trend on *future* revenues not yet reported.

[15]  *See Rubke v. Capitol Bancorp Ltd*, 551 F.3d 1156, 1163 (9th Cir. 2009) ("[T]here is no duty
to disclose income projections in a prospectus."); *In re Burlington Coat Factory Secs. Litig.*,
114 F.3d 1410, 1432 (3d Cir. 1997) ("Companies are *not* obligated either to produce or
disclose internal forecasts …."); *Glassman v. Computervision Corp.*, 90 F.3d 617, 631 (1st
Cir. 1996) ("The federal securities laws impose no obligation upon an issuer to disclose
forward-looking information such as internal projections, estimates of future performance,
forecasts, budgets, and similar data.") (internal quotations omitted); *Krim v. BancTexas*

have specifically rejected the argument that Item 303 creates a duty to disclose internal projections and have routinely granted motions to dismiss Section 11 claims that are based on such alleged failures.  *See, e.g.*, *Rubke*, 551 F.3d at 1163; *Glassman*, 90 F.3d at 631 & n.21; *Sheppard*, 938 F. Supp. at 177.

In doing so, courts have followed the lead of the SEC, which has specifically rejected a rule that would have "require[d] projections or other forward-looking information to be included in [IPO] registration statements."  *Securities Offering Reform*, 70 Fed. Reg. 44722, 44739 (Aug. 3, 2005); *see also* Reg. S-K, 17 C.F.R. § 229.10(b)(1) ("The Commission believes that management must have ***the option*** to present in Commission filings its good faith assessment of a registrant's future performance.") (emphasis added); 54 Fed. Reg. at 22429 (discussing Item 303 and drawing a distinction between "required disclosure regarding the future impact of presently known trends, events or uncertainties and ***optional*** forward-looking information [that] may involve some prediction or ***projection***") (emphasis added).[16]  The SEC's February 28, 2012

---

*Group, Inc.*, 989 F.2d 1435, 1446 (5th Cir. 1993) ("[A]n issuer … has no generalized duty to volunteer an economic forecast.") (internal quotations omitted); *In re Salesforce.com Secs. Litig.*, 2005 WL 6327481, at *5 (N.D. Cal. 2005) ("The law imposes no duty to disclose internal forecasts in the context of an initial public offering."); *Portannese v. Donna Karan Int'l, Inc.*, 1998 WL 637547, at *12 & n.13 (E.D.N.Y. 1998) ("[P]laintiffs essentially seek to hold [the issuer] liable for failing to make projections concerning post-IPO … costs.  Sections 11 and 12(a)(2) do not require such forward-looking disclosures.").

[16] Courts have recognized the SEC's refusal to require a company to disclose projections.  *See, e.g.*, *Billard v. Rockwell Int'l Corp.*, 526 F. Supp. 218, 221 (S.D.N.Y. 1981), *aff'd*, 683 F.2d 51 (2d Cir. 1982) ("No company is required by the SEC to issue projections. . . . Nor has any court ever imposed liability for failure to include projections in a registration statement."); *Burlington Coat Factory*, 114 F.3d at 1432 (same); *In re Lyondell Petrochemical Co. Secs. Litig.*, 984 F.2d 1050, 1052 (9th Cir. 1993) (same).

In fact, "[u]ntil the early 1970s, the Commission ***prohibited*** disclosure of forward-looking information . . . based primarily on [its] perception that such information was inherently unreliable, and that unsophisticated investors would place undue emphasis on the information in making investment decisions."  *Safe Harbor For Forward-Looking Statements*, 59 Fed.

comment letter to Facebook, upon which Plaintiffs rely, *see* Compl. ¶¶ 98-102, 127, further undercuts any suggestion that Facebook was required to disclose its projections.  While the comment letter contains a number of specific requests that reference Item 303, nowhere in the letter (or in any of the SEC's letters) did the SEC request that Facebook disclose its revenue projections.  *See* SEC Comment Letter (Feb. 28, 2012) (attached as Clubok Decl. Ex. L).

The SEC has not mandated such disclosures "because of concerns that [projections] can be unreliable, may be misunderstood or misinterpreted by investors, and thus [are] especially susceptible to abuse by issuers."  *In re Ivan F. Boesky Secs. Litig*, 825 F. Supp. 623, 635 (S.D.N.Y. 1993); *see also Lyondell*, 984 F.2d at 1052-53 ("A far-reaching disclosure requirement [of revenue projections] might not be in the best interests of the market ….").  The SEC has even gone so far as to ***discourage*** issuers from disclosing their projections in advance of an IPO. Although companies are shielded by statute from liability for good faith projections made after going public, *see* 15 U.S.C. § 78u-5(c), that safe harbor does not apply to IPOs.  The SEC requested comment in 2005 on whether the statutory safe harbor "should be extended to [IPO] registration statements," but concluded it should not because companies engaging in IPOs "are generally untested" and thus especially likely to produce uncertain projections.  70 Fed. Reg. at 44739; *accord* Letter of Mary L. Schapiro, SEC Chair, to Comm. on Oversight and Gov't Reform, U.S. House of Rep., at 23 (August 23, 2012) ("Schapiro Letter") (attached as Clubok Decl. Ex. M).  This concern applies with special force to young companies like Facebook that operate in novel and fast-changing industries; indeed, Facebook itself disclosed as much in its

---

Reg. 52723, 52723-24 (Oct. 19, 1994) (emphasis added).  When the SEC modified its rules in 1978, it stated only that companies may "***voluntarily*** … disclose management projections in their filings with the Commission."  *Guides for Disclosure of Projections of Future Economic Performance*, 43 Fed. Reg. 53246, 53247 (Nov. 15, 1978) (emphasis added).

Registration Statement.  *See* Final S-1, at 18 (disclosing that it is "***difficult to forecast our future results***" because "we have a limited operating history" and "operate in a rapidly evolving market") (emphasis added).

In practice, "companies rarely include projections or earnings guidance in the prospectus."  Schapiro Letter, *supra* at 18; *see also* Johnson & McLaughlin, *supra* § 3.04[D].  Companies are reluctant to do so out of a fear that the "forecasts will fail to materialize, and the corporation might be blamed and found liable for misleading the market."  Susanna Kim Ripkin, *Predictions, Projections, and Precautions*, 2005 U. Ill. L. Rev. 929, 932; *see also* 59 Fed. Reg. at 52728  (collecting studies showing that "the threat of mass shareholder litigation … has had a chilling effect on disclosure of forward-looking information").  Courts have recognized the validity of such concerns.  *See, e.g.*, *In re United Brands Co. Secs. Litig.*, 1988 WL 67413, at *5 (S.D.N.Y. 1988) ("[I]f [the company] had speculated on Chiquita's success, it might have been vulnerable to federal securities claims alleging that the speculation was too bright and misleading.  A cynic could easily envision these same plaintiffs from the present lawsuit taking part in this hypothetical case."); *Grossman v. Novell, Inc.*, 120 F.3d 1112, 1125 (10th Cir. 1997) ("Requiring premature quarterly earnings forecasts itself could give rise to potential claims of liability if the forecasts should turn out to be inaccurate.").  As Judge Easterbrook put it, "convincing enterprises that they ought to make projections" is difficult because even "[i]f all estimates are made carefully and honestly, half will turn out too favorable to the firm and the other half too pessimistic.  In either case the difference may disappoint investors, who can say later that they bought for too much … or sold for too little."  *Wielgos v. Commonwealth Edison Co.*, 892 F.2d 509, 514 (7th Cir. 1989).  This very case illustrates Judge Easterbrook's point—

Facebook's actual revenues exceeded the revised projections that Plaintiffs complain were not disclosed.

Although published revenue projections can mislead investors and subject the issuer to liability, internal projections are essential to allow businesses to plan for the future.  *See In re Lyondell*, 984 F.2d at 1052-53 ("A corporation may be called upon to make confidential projections for a variety of sound purposes where public disclosure would be harmful."); *In re Convergent Techs. Secs. Litig.*, 948 F.2d 507, 515 (9th Cir. 1991) ("It is just good general business practice to make [financial] projections for internal corporate use.") (quotation omitted). Recognizing this, the securities laws allow a company to make projections for internal use and to share them with underwriters as part of the pricing process, *see infra* Section II.D, without being required to share them with the entire world.

Nor does it matter that Plaintiffs complain about an alleged "***negative change*** in Facebook's revenue estimates," rather than a single set of projections.  Compl., Heading V; *see also id.* ¶¶ 122, 167, 176-77.  Plaintiffs do not even claim that Facebook was required to disclose the projections it provided to the underwriters in April.  Just as a company is not required to disclose its original projections, so too it is not required to disclose changes to those projections. *See, e.g.*, *In re Worlds of Wonder Secs. Litig.*, 35 F.3d 1407, 1419 (9th Cir. 1994) (rejecting Section 11 claim based on the failure "to disclose the extent to which first quarter sales lagged behind … internal projections"); *Glassman*, 90 F.3d at 631 ("Plaintiffs' nondisclosure claims fail because they base their allegations solely on discrepancies between actual (but undisclosed) intra-quarterly information and [the company's] undisclosed internal projections."); *Steckman v. Hart Brewing, Inc.*, 1996 WL 881659, at *4 (S.D. Cal. 1996) ("[C]ompanies have no duty to disclose intraquarter results, even if those results are lower than the company's internal

projections."), *aff'd*, 143 F.3d 1293 (9th Cir. 1998).   Indeed, that internal projections are estimates subject to frequent change is precisely why they are not required to be disclosed in the first place.  *See* 70 Fed. Reg. at 44739.

### C. Facebook Did Not Have a Duty To Disclose Mid-Quarter Revenue Data in Its Registration Statement.

Plaintiffs seek to avoid the settled law on projections by focusing on Facebook's purported revenue "results" for the quarter that was in progress at the time of the IPO.  They allege that, "in violation of Item 303, the Registration Statement … failed to disclose that … the known trends of increasing mobile usage and the Company's product decisions had had a material negative impact of Facebook's revenue *for the second quarter*."   Compl. ¶ 201 (emphasis added); *see also id.* ¶ 12 (alleging that Facebook told its underwriters that these trends "had already materially impaired Facebook's revenue *for the second quarter*") (emphasis added).  The problem for Plaintiffs is that the second quarter began just six and one-half weeks before the IPO, and Facebook had no "obligation to disclose the results of a quarter in progress." *Arfa v. Mecox Lane Ltd.*, 2012 WL 697155, at *12 (S.D.N.Y.), *aff'd*, 2012 WL 5954124 (2d Cir. 2012); *see also id.* at *9 n.1; *Focus Media*, 701 F. Supp. 2d at 539 (rejecting effort "to hold Defendants liable for [their] failure to disclose financial information about the third quarter before that quarter had concluded").  The SEC has made clear that a registration statement need not include revenue data for the fiscal quarter in which the IPO is held; for that matter, the SEC does not even require disclosure of revenue data from a quarter that is completed up to a month and a half before an IPO.  *See* Regulation S-X, 17 C.F.R. § 210.3-12(a) (mandating that registration statements contain financial statements that are no more than 135 days old).

Holding otherwise would require "the immediate release of data without the benefit of reflection or certainty provided by the traditionally recognized reporting periods." *In re Turkcell*

*Iletisim Hizmetler A.S. Secs. Litig.*, 202 F. Supp. 2d 8, 13 (S.D.N.Y. 2001).  As this Court has explained, "[t]he disclosure structure set out by the SEC ... recognizes how unworkable and potentially misleading a system of instantaneous disclosure out [of] the normal reporting periods would be."  *Arfa*, 2012 WL 697155, at *9 n.1 (internal quotations omitted); *see also Noah Educ. Holdings*, 2010 WL 1372709, at *7 (rejecting Section 11 claim that was premised on nondisclosure of interim financial data as "an end-run around the carefully delineated SEC regulations that specify what financial data must be disclosed in offering documents").

Not surprisingly, courts routinely dismiss Section 11 claims based on the nondisclosure of mid-quarter data.  *See, e.g.*, *In re Worlds of Wonder*, 35 F.3d at 1419 ("The plaintiffs complain that the prospectus failed to disclose the extent to which first quarter sales lagged behind … internal projections.  The quarter, however, was not yet complete."); *Glassman*, 90 F.3d at 631 ("Plaintiffs' nondisclosure claims fail because they base their allegations solely on … intra-quarterly information…"); *Arfa*, 2012 WL 697155, at *9 n.1, *12; *Focus Media*, 701 F. Supp. 2d at 539-40; *Schoenhaut v. Am. Sensors, Inc.*, 986 F. Supp. 785, 793 (S.D.N.Y. 1997) (no duty to disclose reduction in current volume of sales to largest customer); *Blum v. Semiconductor Packaging Materials Co.*, 1998 WL 254035, at *3 (E.D. Pa. 1998) ("[T]here was no duty to disclose fourth quarter earnings before the end of the fourth quarter"); *Zucker v. Quasha*, 891 F. Supp. 1010, 1019 (D.N.J. 1995), *aff'd,* 82 F.3d 408 (3d Cir. 1996) ("Defendants did not have a duty to disclose data from an ongoing fiscal quarter").  This is true even where the IPO occurs just days before the end of a fiscal quarter.  *See, e.g.*, *In re Worlds of Wonder*, 35 F.3d at 1419; *Zucker*, 891 F. Supp. at 1015-16.  As one court put it, "[r]egardless of whether a public offering occurs seventeen or only two days before the close of a fiscal quarter, data concerning a quarter that is in progress is necessarily incomplete."  *Zucker*, 891 F. Supp. at 1016.

Here, the second quarter revenue information that Facebook had prior to its IPO was incomplete and certainly cannot be characterized as "financial results."  Compl. ¶ 11.  Plaintiffs allege only that Facebook had information from the first six and one-half weeks of the second quarter that suggested Facebook's *projected* revenues were too high.  As discussed above, Facebook had no obligation to disclose discrepancies between actual (but undisclosed) intra-quarter information and undisclosed internal projections.  *See Glassman*, 90 F.3d at 631.

Indeed, this case confirms the wisdom of limiting any duty to disclose to information from a completed quarter.[17]  Here the eventual post-IPO results from Facebook's completed second quarter showed a revenue *increase* of almost 12% over the first quarter of 2012 and 32% from the second quarter in the previous year.  *See* Final S-1, at 43; Facebook's Form 10-Q Disclosure, at 18.  Even if Facebook's actual 2012 second quarter results had matched the overly conservative lower end of the May 9 projection range of $1.1-1.2 billion, that would still have represented growth over the first quarter revenue of $1.058 billion, and the second quarter 2011 revenue of $954 million.  Growth plainly cannot constitute an "extreme departure" warranting disclosure. *See, e.g.*, *In re N2K, Inc. Secs. Litig.*, 82 F. Supp. 2d 204, 208 (S.D.N.Y. 2000) (dismissing complaint because 8.6% decline in completed quarter results "cannot reasonably be

---

[17] This Court in *Arfa* recognized the distinction between recently-completed quarters and quarters still in progress, finding no "authority for the proposition that the Defendants were obligated to disclose the results of a quarter in progress." *Arfa*, 2012 WL 697155, at *9 & n.1.  Other courts have dismissed suits based on the nondisclosure of data from a quarter in progress even where, unlike here, the mid-quarter data showed a decline in revenue from previously reported quarters.  *See In re Worlds of Wonder*, 35 F.3d at 1419 (even though company's performance was "substantially" worse than the same quarter of the preceding year, no obligation "to disclose the extent to which first quarter sales lagged behind WOW's internal projections" where "[t]he quarter … was not yet complete"); *Glassman*, 90 F.3d at 631-32 (even though sales were lower than the corresponding numbers for the prior five quarters, no obligation to disclose hard data from seven weeks into the quarter); *Schoenhaut*, 986 F. Supp. at 791 (even though sales had declined 11 percent in past month, no obligation to disclose financial data from the first 26 days of a quarter in progress).

characterized as an 'extreme departure' from the range of anticipated results"); *In re Turkcell*, 202 F. Supp. 2d at 12 (same for 9% decline in completed quarter operating income).

### D. The Alleged "Selective Disclosures" Do Not Create Any Duty to Make Additional Disclosures.

Plaintiffs also complain that Facebook disclosed its revenue projections to its underwriters, who allegedly incorporated that information into their own forecasts and shared those forecasts with their institutional clients, but not retail investors. *See, e.g.*, Compl. ¶¶ 6-13, 106-09, 122-38, 176-85, 188(d)-(e), 201. Plaintiffs insist that these alleged selective disclosures "confirm that the declines in the Company's estimated revenue were highly material" because otherwise "Facebook obviously would not have felt the need to make" disclosures to its underwriters. *Id.* ¶ 177. But even if one were to accept that dubious supposition, a "material omission … is actionable ***only if*** the omitted facts were … required by SEC regulations to be stated in the relevant communication." *Focus Media*, 701 F. Supp. 2d at 539 (emphasis added). And both courts and the SEC have rejected the theory that selective disclosures, even of material information, trigger a duty to print that information in a registration statement.

In *Lyondell*, for instance, the plaintiffs argued that once the company "opened the door by presenting forecasts to Morgan Guaranty" and other lender banks, "it was obligated to tell the whole truth to the public." 984 F.2d at 1052. The Ninth Circuit soundly rejected that theory, declining "to adopt a 'whole truth' exception in cases such as this where a corporation has disclosed internal projections outside the confines of the company, but not to the public generally." *Id.* Other courts have agreed. *See, e.g.*, *Glassman*, 90 F.3d at 631 n.20 ("That internal forecasts are disclosed to underwriters does not make them any more susceptible to a duty to disclose to the investing public."); *Anserphone of New Orleans, Inc. v. Protocol Commc'ns, Inc.*, 2002 WL 31741254, at *10 (E.D. La. 2002) (holding that the fact the issuer

disclosed internal plans and business projections to its investment bankers did not create a duty to disclose that information to the public).[18]

This case law reflects the SEC's considered position.   The SEC's Regulation FD normally requires that where "an issuer … discloses any material nonpublic information … to any person" who might trade on that information, "the issuer shall make public disclosure of that information." 17 C.F.R. § 243.100(a).  Yet, despite being well aware of the industry practice in IPOs of sharing projections with underwriters and institutional investors,[19] in 2005 and 2000, the SEC refused to apply this rule to statements made in connection with an IPO.  *See* 70 Fed. Reg. at 44760 ("Regulation FD will not apply to … [a]n oral communication made in connection with the registered securities offering after filing of the registration statement …."); *Selective Disclosure and Insider Trading*, 65 Fed. Reg. 51716, 51719 (Aug. 24, 2000) ("In response to concerns about the interplay of Regulation FD with the Securities Act disclosure regime, we

---

[18]  Similarly, this Court concluded in its February 13 decision dismissing the Derivative Actions that Facebook had no duty to disclose projections, notwithstanding a similar allegation by the Derivative Plaintiffs that "Facebook's executives selectively disclosed to the Lead Underwriters that certain negative trends were causing the Company's revenues to fall short of earlier estimates for the second quarter of 2012 during the roadshow."  Derivative Op., at *3, *19.

[19]  *See supra* Background, Section B (collecting authorities).  Indeed, the SEC referred to the long-standing practice as the "process of filtration."  *Disclosure to Investors: A Reappraisal of the Federal Administrative Policies Under the '33 and '34 Acts*, at 52 (1969) (attached as Clubok Decl. Ex. N); *see also Report of the Advisory Committee on Corporate Disclosure to the SEC*, 95th Cong., at A-313 (Comm. Print 1977) ("Projection information is already available to investors through investment advisers (the so-called 'filtration process').").  Even Henry Blodget, upon whose articles for *Business Insider* Plaintiffs rely throughout the Complaint, admits that the alleged "selective disclosures" are standard industry practice.  *See* Blodget, *Inside Story*, *supra* (explaining that it is "industry convention" in IPOs that:  (1) forward-looking "estimates are usually developed through close collaboration between the underwriters' research analysts and company management"; (2) such "estimates are conveyed verbally to institutional investors who are considering investing in the IPO"; and (3) "these estimates are not published anywhere").

have expressly excluded from the scope of the regulation communications made in connection with most securities offerings registered under the Securities Act."). The Commission explained that applying Regulation FD to IPOs could chill communication between issuers, underwriters, and institutional investors that is necessary to allow underwriters to accurately price the issuer's stock. *See* 70 Fed. Reg. at 44760 (reiterating that the SEC "continue[s] to believe that subjecting oral communications that occur in connection with a registered offering in a capital formation transaction to a public disclosure requirement could adversely affect the capital formation process"). The SEC considered and rejected a similar proposal in the 1970s that would have required issuers that share projections with analysts "to file such projections with the Commission" so that "all investors [would] have equal access." *Disclosure of Projections of Future Economic Performance*, 38 Fed. Reg. 7220, 7221 (Feb. 2, 1973); *see also Proposed Guides for Disclosure of Projections of Future Economic Performance*, 41 Fed. Reg. 19986, 19987 (Apr. 23, 1976) (noting that the proposal was rejected "because of the diversity of views on the importance and reliability of projections," the "variance between company projections and actual results").

Accordingly, commentators have recognized that issuers are permitted to disclose their pre-IPO projections to underwriters without being required to print them in their registration statements. *See Johnson & McLaughlin*, *supra* § 3.04[A][6] ("It goes without saying that because Regulation FD does not apply to IPO candidates there is no improper 'selective disclosure' in an IPO candidate's permitting the analysts to have access to the company's internal projections."). Plaintiffs would have this Court impose—retroactively—a rule that the SEC has specifically and thoughtfully rejected. The Court should decline the invitation. *See In re Morgan Stanley*, 592 F.3d at 366 (noting that SEC disclosure rules "attempt to balance the

costs and benefits of additional disclosures" and courts should be careful not to upset that balance); *see also J & R Mktg. v. General Motors Corp.*, 549 F.3d 384, 396-97 (6th Cir. 2008) ("[T]here needs to be 'healthy limits' on the duty to disclose.  Those 'healthy limits' are determined by Congress and the SEC.  We are not authorized to impose a wide-ranging duty to disclose anything that a person can allege was nonpublic, material information.").

## III.   FACEBOOK DID NOT OMIT ANY INFORMATION THAT WAS NECESSARY TO PREVENT EXISTING DISCLOSURES FROM BEING MISLEADING.

Plaintiffs seek to fit themselves within the third potential basis for liability—"an omission of information that is necessary to prevent existing disclosures from being misleading." *In re Morgan Stanley*, 592 F.3d at 359.  They allege that Facebook "failed to disclose the information required by Rule 408 of SEC Regulation C, which also required Facebook to disclose that increasing mobile usage and the Company's product decisions had had a material negative impact on its revenues, and that Facebook already had significantly lowered its estimated revenues as a result."  Compl. ¶ 188(d).  But Rule 408 simply parrots the language of Sections 11 and 12: "In addition to the information expressly required to be included in a registration statement, there shall be added such further material information, if any, as may be necessary to make the required statements, in light of the circumstances under which they are made, not misleading." 17 C.F.R. § 230.408(a); *see In re Morgan Stanley*, 592 F.3d at 365.  As discussed, Facebook disclosed that increasing mobile usage and certain product decisions caused a reduction in the number of ads delivered per user, which had impacted the company's revenue growth and would impact future revenue growth if mobile usage continued to increase and Facebook remained unable to monetize such usage.  *See supra* Section I; Final S-1, at 57. Plaintiffs' theory that Facebook violated Rule 408 is largely duplicative of their other theories and should be dismissed for the same reasons.

As shown above at pages 24-25, Facebook's "may" statements also were opinions, and Plaintiffs have abjured any allegation that Facebook did not believe these opinions.  In these circumstances, such inactionable opinions cannot be used as the trigger for an omissions claim.  *See NECA-IBEW Pension Trust Fund v. Bank of America Corp.*, 10 Civ. 0440, at 1-2 (S.D.N.Y. Mar. 16, 2012) (Ex. O); *Freidus v. ING Groep N.V.*, 736 F. Supp. 2d 816, 835-36 (S.D.N.Y. 2010).  Nor can Plaintiffs suggest that Facebook's disclosures about past increased mobile usage and product decisions were misleading because they were not accompanied by internal revenue projections or mid-quarter data.  Such a theory has been repeatedly rejected because companies have no duty to disclose such projections.  *See Lyondell*, 984 F.2d at 1052 (rejecting the claim that the company's "failure to disclose internal projections constitutes a material omission that rendered [its] forward-looking statements misleading" because the company did not have a "legally cognizable duty to disclose the projections" in the first place); *Convergent*, 948 F.2d at 515-16 (warnings do not become misleading simply because the company "had at its disposal more detailed internal … projections"); *In re Worlds of Wonder*, 35 F.3d at 1419 (warning that company "expected lower net sales" did not trigger a "duty to disclose the precise extent of the anticipated revenue drop").  In light of the SEC's considered refusal to require the disclosure of projections or mid-quarter data under the specific rules governing those topics, Plaintiffs cannot smuggle such a requirement in through the general standard of Rule 408.  *See In re Morgan Stanley*, 592 F.3d at 365-66 (rejecting an attempt to use Rule 408 to impose a disclosure obligation that the SEC had rejected under its more specific rules).

## IV.   ANY OMITTED INFORMATION OR ALLEGEDLY MISLEADING STATEMENTS WERE IMMATERIAL AS A MATTER OF LAW.

Even if Plaintiffs could show that the Registration Statement contained misleading statements, or omitted information which Facebook had an affirmative duty to disclose, such

alleged errors would be immaterial as a matter of law.  In order to be considered material, a statement or omission must be "viewed by the reasonable investor as having significantly altered the 'total mix' of information made available."  *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976).  Here, however, Facebook repeatedly provided the very information about mobile usage that Plaintiffs say should have been disclosed.  As this Court has held:

> [Facebook] repeatedly made express and extensive warnings in the Company's Registration Statement, drafts of the Registration Statement and in its final Offering Documents about the trend of increased use of mobile applications. Thus, even if internal projections could be consider material to the IPO, [] Plaintiffs have not demonstrated that the Facebook projections would have significantly altered the total mix of information in the marketplace, considering that these disclosures were publicly disseminated.

Derivative Op. at *19 (internal quotations omitted).   The alleged misrepresentations and omissions identified in the Complaint add nothing to the "total mix of information" when viewed in context.  *See Olkey*, 98 F.3d at 5; *I. Meyer Pincus & Assocs. v. Oppenheimer & Co., P.C.*, 936 F.2d 759, 763 (2d Cir. 1991).

Facebook's Registration Statement "expressed caution about revenue growth" due to growing mobile usage and product decisions.  Derivative Op. at *1.  The Registration Statement informed the market that use of Facebook on mobile devices "*has been*" and "*will*" continue to be a substitute for use on personal computers, Final S-1, at 51 (emphasis added); that the company did not "currently directly generate any meaningful revenue" from mobile use, and its "ability to do so" was "unproven," *id.* at 14; *see also id.* at 51; that increased mobile usage and product decisions resulted in fewer ads being displayed per user; that this "ha[d] continued" into the second quarter; and that, absent a change in circumstances, mobile substitution "would" negatively affect future revenue, *id.* at 57, 14.  This is precisely the information Plaintiffs say that Facebook's projections would have conveyed.  *See, e.g.*, Compl. ¶ 190 ("as a direct result of

increasing mobile usage," projected revenues for second quarter and annual revenues were lower).  In this context, the additional information Plaintiffs want would be at best cumulative and thus immaterial.  *See Arfa v. Mecox Lane Ltd.*, 2012 WL 5954124, at *1 (2d Cir. 2012) (when Registration Statement "disclosed … trends" of "increased online sales and decreased directly-operated store sales," additional "third and fourth quarter data would not alter the 'total mix' of available information").[20]

Plaintiffs vastly overstate the supposed "decrease in expected revenue" that they allege Facebook was predicting from the trend of increased mobile usage.  As noted, Facebook's revised revenue projection for the second quarter remained within the range of $1.1 to $1.2 billion that it initially projected.  Plaintiffs' tendentious contention that the decrease was "as much as 8.33%," Compl. ¶ 190, assumes an initial forecast of $1.2 billion and a revised forecast of $1.1 billion, but that is not what the Complaint alleges.  Nor is the change in predicted annual

---

[20] Moreover, while Plaintiffs allege that during the first several weeks of the second quarter increasing mobile usage and product decisions had a *material* impact on revenues, *see, e.g.*, Compl. ¶ 122 (during the second quarter "two developments in its business" "had severely impaired its" revenues), they fail to offer any facts supporting this alleged *material* impact. *See Garber v. Legg Mason, Inc.*, 347 F. App'x 665, 669 (2d Cir. 2009) (finding allegations of a "'dramatic increase in integration-related expenses' … too conclusory to permit us to determine whether plaintiffs have adequately pleaded materiality").  Furthermore, as to product decisions specifically, Plaintiffs ignore Facebook's specific disclosure that while product decisions resulted in fewer ads per page, and thus contributed to the trend of daily active users increasing faster than ads delivered, *see* Final S-1, at 53, 57, those same decisions also led to an "increased … average price per ad," and Facebook thus "estimate[d] that the decrease in the number of ads displayed and the increase in average price per ad *approximately offset each other such that the impact on total revenue was minimal.*"  *Id.* at 53 (emphasis added); *see also id.* at 61.  Plaintiffs allege no facts to demonstrate that, after this offset, the net effect was materially negative—and their conclusory allegations to the contrary fall far short of what federal pleading standards require.  *In re Britannia Bulk Secs. Litig.*, 665 F. Supp. 2d 404, 416-17 (S.D.N.Y. 2009) (dismissing claims under Sections 11 and 12(a)(2) where "the Offering Documents contain an abundance of cautionary language about Britannia's use of FFAs that Plaintiff simply ignores" and where "[t]he Offering Documents themselves disclose" facts alleged to be omitted); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

revenue from $5 billion to a range of $4.825 to $4.85 billion, a shift of 3% to 3.5%, a material change.   Courts have repeatedly treated comparable variances even in ***actual*** results as immaterial as a matter of law.   *See, e.g.*, *Glassman*, 90 F.3d at 633 n.26 (explaining that deviations of 3% to 9% were not material); *In re Turkcell*, 202 F. Supp. 2d at 13 (finding 9% drop in operating income from first to second quarter not sufficient to warrant disclosure).

The fact that Facebook shared its revised projections with the underwriters' analysts, who in turn revised their own forecasts, Compl. ¶¶ 106, 108, does not "confirm," as Plaintiffs contend, that Facebook's revised projections would have "significantly altered the total mix of information in the market."   Compl. ¶ 178; *see also id.* ¶¶ 177, 179-80.   Facebook simply followed industry custom in providing its original and revised projections to the Syndicate Analysts. *See supra* Background, Section B.   Plaintiffs do not allege that Facebook previously disclosed its original projections to the public, nor do Plaintiffs allege that Facebook was required to do so.   There is no plausible basis for suggesting that Facebook's determination that it should *update* the projections previously given to analysts somehow made the updated projections new material information it had a duty to share with the public.   *Cf. Glassman*, 90 F.3d at 631.

Moreover, Facebook disclosed updated information about the impact of mobile usage and product decisions to the public when it issued its May 9, 2012 Free Writing Prospectus—which the financial media widely reported to mean that these factors were continuing to harm Facebook's revenue growth.   *See supra* note 5 and accompanying text (collecting articles). Indeed, that prospectus was described as "a *stunning preview* of a lower than expected Q2 as a result of a shift to mobile devices adversely impacting Facebook's ad revenue growth."   PrivCo, *supra* (emphasis added).   And at least ***sixteen*** publications also reported that Facebook was

"*telling analysts* that sales may not meet their most optimistic projections."  *See supra* note 6 and accompanying text (collecting 16 articles).

That Facebook's disclosures and the media reporting provided narratives rather than specific numbers makes no difference.  Numerical data will not alter the total mix of available information where, as here, the narrative explanations were sufficient.  *See Arfa*, 2012 WL 5954124, at *1 (holding that underlying numerical data was "not material ... because the Registration Statement already disclosed the trends" themselves).  As the financial media recognized, "[i]t's hard *not* to [] make a correlation between an increase in mobile over web usage and a decline in revenue, *especially when Facebook connects the two in its latest filing*."  Jennifer Van Grove, VentureBeat, *Facebook's Mobile Risk by the Big, Bad Numbers*, May 13, 2012 (emphasis added).[21]

Plaintiffs also claim that the alleged omissions and misstatements must have been material because, "[h]ad investors been on notice of the pronounced decline in Facebook's revenues prior to the IPO": (1) "investor demand for Facebook shares would not have risen to 'astronomical' levels," (2) "Facebook would not have ... significantly increas[ed] both the size of the IPO and its price," and (3) Facebook's stock would not have declined after the *Reuters* articles were published.  Compl. ¶ 183-84.  But such speculation about market reactions are "too blunt an instrument to be depended on in considering whether a fact is material."  *Hutchison v. Deutsche Bank Secs. Inc.*, 647 F.3d 479, 490 (2d Cir. 2011) (internal quotations omitted); *Truk*

---

[21]  Plaintiffs also claim that "Facebook's own disclosures establish the importance of Facebook's undisclosed revenue declines to the market" because they "highlight[]" the importance of mobile usage to revenue.  Compl. ¶ 185.  But Plaintiffs' concession that Facebook's narrative disclosures demonstrated the importance of mobile usage necessarily means that additional numerical disclosures would not have significantly altered the total mix of information in the market.

*Int'l Fund LP v. Wehlmann*, 737 F. Supp. 2d 611, 624-25 (N.D. Tex. 2009) ("In other words, although the drop in Cano's stock price following the disclosure of the decrease in reserves is consistent with that decrease being material, it does not *suggest* that the decrease was material."), *aff'd*, 389 F. App'x 354 (5th Cir. 2010).  Moreover, Plaintiffs' conclusory claim that demand for Facebook's stock rose and fell based on revised projections is especially implausible given all the other factors affecting demand for Facebook's stock.  *See Geiger v. Solomon-Page Group, Ltd.*, 933 F. Supp. 1180, 1188 (S.D.N.Y. 1996) ("Evidence of stock price movement … is not determinative.  The stock price may have fallen for many reasons ….") (citations omitted); *N.J. Carpenters Health Fund*, 709 F.3d at 121 (noting that a court will not accept a plaintiff's desired inference where "'alternative explanation[s]'" are far more likely) (quoting *Twombly*, 550 U.S. at 567).

At bottom, no reasonable investor could have been misled after reading Facebook's offering materials into thinking that mobile usage and product decisions were not impacting, or would not continue to impact, revenue growth.  An additional disclosure in the Registration Statement that Facebook had advised its underwriters that the company may come in on the lower end of its second quarter revenue projections in light of the continuation of trends that had already been disclosed would not "[be] viewed by the reasonable investor as having significantly altered the 'total mix' of information."  *TSC Indus., Inc.*, 426 U.S. at 449; *see also Lin v. Interactive Brokers Group, Inc.*, 574 F. Supp. 2d 408, 419 (S.D.N.Y. 2008) ("If the alleged omission or misstatement is explicitly addressed in the risk disclosures of the offering documents, it is immaterial.").

## V.    PLAINTIFFS CANNOT ESTABLISH LOSS CAUSATION.

Independently, Plaintiffs fail to state a claim because "the absence of loss causation is apparent on the face of the complaint."  *Blackmoss*, 2010 WL 148617, at *11; *see also Iowa Public Emps' Ret. Sys.*, 620 F.3d at 145 (affirming dismissal of Section 11 claims for lack of loss causation because it was "apparent on the face of the complaint that the stock price decline (and the plaintiffs' resulting losses) cannot be attributed to the prospectus's failure to disclose") (internal quotations omitted).

Here, Plaintiffs attribute loss causation to stock price declines on May 21 and 22 after post-IPO media reports that Facebook had (1) "lowered guidance" concerning its projections, and (2) shared its revised projections with analysts.  Compl. ¶¶ 161-68.  These allegations are plainly insufficient.  As an initial matter, not one word in any of the alleged corrective disclosures mentions Facebook's "product decisions," meaning that Plaintiffs' own allegations show the absence of any tie between the May 21 and 22 stock drops and the revelation of any new information about such decisions.  *See Janbay v. Canadian Solar, Inc.,* 2013 WL 1287326, at *15 (S.D.N.Y. 2013) (Sweet, J.) ("The lack of any references to that sale … in the June 1 press release demonstrates Plaintiffs' failure to plead loss causation."); *Iowa Public Emps' Ret. Sys.*, 620 F.3d at 145 (no loss causation where the purported corrective disclosure did not actually disclose the allegedly omitted fact); *In re Britannia*, 665 F. Supp. 2d at 419 (same where the purported corrective disclosure "[did] not speak at all" to the allegedly omitted fact).

More fundamentally, however, the fact that Facebook had "lowered [its] guidance" and shared its revised projections with analysts was already publicized in at least 16 media reports more than a week before the IPO.  *See* Serena Saitto, *et al*., *Facebook IPO Said to Get Weaker-Than Forecast Demand*, Bloomberg (May 11, 2012); *supra* note 6 and accompanying text

(collecting news reports).[22]  Media reports repeating that prior information accordingly cannot be the cause of the stock drops in question.  *See City of Omaha, Neb. Civilian Emps.' Ret. Sys. v. CBS Corp.*, 679 F.3d 64, 69 (2d Cir. 2012) (because "declines in advertising revenues, and the expectations of analysts … were matters of public knowledge, ... [the] complaint does not allege in a plausible fashion that the market price of [Defendant's] stock was inflated" by alleged omissions of such information).[23]

　　　Plaintiffs nonetheless allege that two Reuters stories—late on May 18 and early on May 22—constitute corrective disclosures because they reported the purportedly "new significant facts" that Facebook had given downward guidance before the IPO and analysts and large investors knew this.  Compl. ¶¶ 162, 165, 170.  But each of those articles repeats information that was already widely publicized before the IPO and thus "does not constitute a corrective disclosure."  *In re Omnicom Group, Inc. Secs. Litig.*, 597 F.3d 501, 512 (2d Cir. 2010) ("A

---

[22]  Indeed, *Business Insider* immediately recognized that the *Reuters* story was simply repeating previously-reported information.  *See* Blodget, *If This Really Happened During the Facebook IPO, Buyers Should Be Mad as Hell...*., Bus. Insider, May 19, 2012 (noting that, during Facebook's pre-IPO road shows, "reports appeared that Facebook had reduced the earnings guidance it was giving research analysts," and that "***now Reuters has just reported the same thing again***.") (emphasis added).

[23]  *See also Barnes v. Osofsky*, 254 F. Supp. 721, 725 (S.D.N.Y. 1966) ("[T]here can be no question but that adequate information was available to all prudent interested parties by that time, correcting any misinformation and therefore, no one who acquired shares after [that date] could sustain a claim of injury by reliance on the prospectus."), *aff'd*, 373 F.2d 269 (2d Cir. 1967); *In re Smart Techs., Inc. S'holder Litig.*, 2013 WL 139559, at *7 (S.D.N.Y. 2013) ("Any investor who purchased after the . . . corrective disclosure would have known of the alleged 'untruth or omission at the time of his or her acquisition of the security' . . . ."); *Debora v. WPP Grp. PLC*, 1994 WL 177291, at *3 (S.D.N.Y. 1994) (dismissing complaint because Plaintiff could not "establish that the alleged misrepresentation caused him to purchase the [shares] since the [public disclosure] had already been made when he purchased the shares"); *In re Veeco Instruments Inc. Secs. Litig.*, 2007 WL 4115809, at *13 (S.D.N.Y. 2007) (Plaintiffs "suffered an economic loss only if they bought shares" before the public disclosure was made).

negative journalistic characterization of previously disclosed facts does not constitute a corrective disclosure of anything but the journalists' opinions."); *In re Manulife Fin. Corp. Secs. Litig.*, 2012 WL 4108104, at *7 (S.D.N.Y. 2012) (dismissing complaint where the alleged corrective disclosure "did not reveal anything new" and therefore "does not qualify as a corrective disclosure"); *see Blackmoss*, 2010 WL 148617, at *11 (dismissing '33 Act complaint where defendant "disclosed updated information" weeks prior to alleged corrective price drop). Likewise, public reporting of negative investor "opinions" about previously reported facts do not constitute a corrective disclosure. *Meyer v. Greene*, 710 F.3d 1189, 1199 (11th Cir. 2013) (citing cases). "In fact, such opinions are exactly the type of confounding information … that do not qualify as corrective disclosures for purposes of loss causation." *Id.*

Here, the two articles that Plaintiffs contend were "corrective disclosures" did not reveal any new material facts to the market.

- The May 18 Reuters article stated: "Facebook [] altered its guidance for research earnings last week, during the road show, a rare and disruptive move." Compl. ¶ 161 (quoting Damouni & Oran, *Morgan Stanley Made Big Bet on Facebook*, Reuters, May 18, 2012). But this merely repeated what was already in the numerous pre-IPO media reports. *Bloomberg*, for instance, reported on May 11 that Facebook was "telling analysts that sales may not meet their most optimistic projections." Saitto, *supra*; *see also supra* note 6 and accompanying text (collecting in addition 15 similar articles).

- The May 22 Reuters article, while acknowledging that Facebook's May 9 SEC filing itself had "expressed caution about revenue growth due to a rapid shift by users to mobile devices," noted that the analysts had shared reduced forecasts with some investors. *See* Allistair Barr, *Insight: Morgan Stanley Cut Facebook Estimates Just Before IPO*, Reuters, May 22, 2012. But this too was known before the IPO. Business Insider already had stated on May 10 that some "investors" had been told that Facebook would not meet their most optimistic prior projections. Blodget, *UH OH: Facebook IPO Seeing 'Weak Demand,' supra*. Moreover, it had been widely known for decades that, in IPOs, when analysts receive issuer projections—as was widely reported on May 10—the analysts routinely use the projections to make forecasts that are shared with large institutional investors.[24] Securities

---

[24] Indeed, since at least 1961, commentators had debated whether the SEC should *change* its rules to prohibit this standard practice. *See, e.g.*, Harry Heller, *Disclosure Requirements*

liability cannot be based on matters of common knowledge.  *See In re IndyMac Mortgage-Backed Secs. Litig.*, 718 F. Supp. 2d 495, 512 (S.D.N.Y. 2010) ("[T]here was no duty to disclose the ratings agencies' conflicts of interest, as the information was known widely."); *Shemian v. Research In Motion Ltd.*, 2013 WL 1285779, at *21 (S.D.N.Y. 2013) ("As a matter of general public knowledge, this claimed omission is thus not material.").

Given that Plaintiffs' alleged corrective disclosures did not contain any *new* material fact that was revealed to the market only after the IPO, loss causation is absent.

Paragraph 168 of the Complaint tries to repair these deficiencies by citing three articles as purportedly linking the May 21 and May 22 price declines to reactions to the May 18 and May 22 Reuters articles.  They do nothing of the sort—they merely repeat the recycled information in those Reuters articles and also report the stock price drops, without themselves opining on what caused the drops.  *See* Steven Musil, *Did Facebook Underwriter Spook Investors Before IPO?*, CNET, May 21, 2012; Steve Schaefer, *Report: Morgan Stanley Cut Facebook Outlook Just Before IPO*, Forbes, May 22, 2012; Cowan & Moyer, *Facebook Slides Amid Roadshow Questions*, Wall St. J., May 22, 2012.  Even if they had proffered or implied such an opinion,

---

*Under Federal Securities Regulation*, 16 Bus. Law. 300 (1961); Bruce Alan Mann, *Prospectuses: Unreadable or Just Unread?—A Proposal to Reexamine Policies Against Permitting Projections*, 40 Geo. Wash. L. Rev. 222 (1971) (discussing SEC's policy of encouraging "filtration process," which "emphasizes the importance of the professional intermediary, whose analysis, projections, and recommendations result in investment decisions," and who make "use of management's forecasts" to do so); Joseph McLaughlin, *Integrated Disclosure, Shelf Registration, and Other Due Diligence Challenges in the Public Offering Process*, 886 Practising Law Institute 721 (1995) (discussing standard practice of issuers declining to include internal earnings projections in the prospectus but verbally communicating them to analysts, who in turn use them to generate estimates to communicate to the analysts' large customers); Christine Hurt, *Moral Hazard and the Initial Public Offering*, 26 Cardozo L. Rev. 711, 736-38 (2005) ("[R]etail investors are restricted from fully participating in the market for IPOs because they are not privy to the same information as the institutional investors.").

"[a] negative journalistic characterization of previously disclosed facts does not constitute a corrective disclosure of anything but the journalists' opinions." *Omnicom*, 597 F.3d at 512.[25]

The limits on loss causation "exist[] because private securities fraud actions are 'available, not to provide investors with broad insurance against market losses, but to protect them against those economic losses that misrepresentations actually cause.'" *Id.* at 510 (quoting *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 345 (2005)). Thus, especially where there are obvious reasons for Facebook's stock decline on May 21 and May 22 in new post-IPO events, such as NASDAQ's trading errors and subsequent notification of a claims submission process for resultant losses,[26] that had no connection to any alleged misrepresentation or omission in the

---

[25] Incredibly, paragraph 162 of the Complaint cites one commentator's initial May 19 opinion that "securities laws" required Facebook to disclose its projections. This ignores that the same commentator on May 22 retracted this opinion, stating that Facebook had acted "in conjunction with industry convention" and changing his opinion to: "[t]he SEC needs to *change* the rules here." Blodget, *Inside Story*, *supra* (emphasis added). That commentator later admitted that "if anyone had read the Facebook IPO prospectus, they would have learned, among other things [that] . . . Facebook's growth rate was decelerating rapidly [and that] Facebook's user-base was ***rapidly transitioning to mobile devices, which produce much less revenue***. . . . Facebook shareholders may be annoyed by those facts, especially now that the value of their stakes are getting demolished. But ***they can't say that they weren't warned***." Henry Blodget, *It's Becoming Clear That No One Actually Read Facebook's IPO Prospectus or Mark Zuckerberg's Letter to Shareholders*, Bus. Insider, Aug. 31, 2012 (emphasis added).

[26] NASDAQ experienced a massive trading debacle on May 18 that "spurred a wave of selling as traders realized they held shares bought via orders they had tried to cancel." Jenny Strasburg, *et al.*, *Nasdaq CEO Lost Touch Amid Facebook Chaos*, Wall St. J., June 11, 2012; Shayndi Raice, *et al.*, *Facebook's IPO Sputters*, Wall St. J., May 18, 2012 ("The glitches …. helped contribute to the lackluster price for Facebook shares …."). The resulting lack of an upward "pop" in Facebook's share price on May 18 further "prompted a selloff." Raice, *Facebook's IPO Sputters*, *supra*; *see* Compl. ¶¶ 158, 160. Then, NASDAQ issued an alert notifying investors of a deadline of noon on May 21 to submit claims for losses suffered as a result of the trading errors. Equity Trader Alert No. 2012-21, NASDAQ OMX, *NASDAQ Proposes Policy for Unfilled Orders in the Facebook Inc. (FB) IPO Cross* (May 21, 2012). This "caused investors to sell shares so they could file a claim with the Nasdaq," resulting in "Facebook's stock dropp[ing] like a stone at the [May 21] open," only to rise *after* NASDAQ's noon deadline passed. John Melloy, *How Facebook's Stock Selloff Nearly*

Prospectus, dismissal is warranted.  *See In re Britannia*, 665 F. Supp. 2d at 419-20 (loss causation was negated where it was apparent that other "unrelated disclosures" caused the stock price to decline).

## VI.   PLAINTIFFS' SECTION 12 AND 15 CLAIMS FAIL AS A MATTER OF LAW.

Because Plaintiffs cannot show that Facebook's Registration Statement contained a material misrepresentation or omission, their Section 12 claim must be dismissed as well.  *See Lasker v. N.Y. State Elec. & Gas Corp.*, 85 F.3d 55, 57-58 (2d Cir. 1996) (Section 11 and Section 12 claims both "require[] that [plaintiffs] identify a materially misleading statement made by the defendants."); *In re Cosi, Inc. Secs. Litig.*, 379 F. Supp. 2d 580, 586 (S.D.N.Y. 2005) (same). Indeed, Plaintiffs do not allege that any communications outside of the Registration Statement were misleading, *see* Compl. ¶¶ 186-202, making their Section 12 claims entirely duplicative of their Section 11 claim.  *See In re Agria Corp. Secs. Litig.*, 672 F. Supp. 2d 520, 525 (S.D.N.Y. 2009) ("A plaintiff who fails to plead a § 11 claim necessarily fails to plead a § 12(a)(2) claim as well.") (internal quotations omitted).

Moreover, several plaintiffs admit they did not purchase shares in the IPO.  *See* Compl. ¶¶ 31-33 (alleging that several plaintiffs purchased stock "traceable to the IPO").   These plaintiffs lack standing to bring a section 12 claim.  *See Johnson*, 2013 WL 214297, at *16 (in order to "have standing under Section 12(a)(2)," plaintiffs must "plead that the securities at issue were purchased in the initial public offering") (collecting cases); *cf. DeMaria*, 318 F.3d at 178 (contrasting Section 11's "remedy for 'any person' who acquires a security issued pursuant to a

---

*Turned Into a Run,* CNBC.com, May 22, 2012 (Facebook stock "show[ed] a plunge of as much of 14 percent to $33 in the morning *and then a recovery after the Nasdaq deadline passed*.") (emphasis added).

[faulty] registration statement," with Section 12's narrow creation of "liability on the part of a seller 'to the person purchasing such security from him.'") (quoting Sections 11 and 12, respectively).

Finally, "[w]hen a complaint does not allege a primary violation of Section 11 [or 12], there can be no control person liability." *Arfa*, 2012 WL 697155, at *13; *accord In re Alliance Pharm. Corp. Secs. Litig.*, 279 F. Supp. 2d 171, 197 (S.D.N.Y. 2003).  Accordingly, Plaintiffs' Section 15 claim must also be dismissed.

## CONCLUSION

For the foregoing reasons, the Complaint should be dismissed for failure to state a claim upon which relief can be granted.

DATED:  April 30, 2013

<table>
<tr><td>

Susan E. Engel<br>
Kellen S. Dwyer<br>
Bob Allen<br>
KIRKLAND & ELLIS LLP<br>
655 Fifteenth St. NW<br>
Washington, DC 20005<br>
Telephone: (202) 879-5000<br>
Facsimile: (202) 879-5200

</td><td>

Andrew B. Clubok<br>
(andrew.clubok@kirkland.com)<br>
Brant W. Bishop, P.C.<br>
KIRKLAND & ELLIS LLP<br>
601 Lexington Avenue<br>
New York, NY 10022<br>
Telephone: (212) 446-4800<br>
Facsimile: (212) 446-4900

</td></tr>
<tr><td>

Richard D. Bernstein<br>
Elizabeth J. Bower<br>
WILLKIE FARR & GALLAGHER LLP<br>
1875 K Street, NW<br>
Washington, DC 20006<br>
Telephone: (202) 303-1000<br>
Facsimile: (202) 303-2000

</td><td>

Tariq Mundiya<br>
Todd G. Cosenza<br>
Sameer Advani<br>
WILLKIE FARR & GALLAGHER LLP<br>
787 Seventh Avenue<br>
New York, NY 10019-6099<br>
Telephone: (212) 728-8000<br>
Facsimile: (212) 728-8111

</td></tr>
</table>

*Attorneys for Facebook, Inc. and Individual Facebook Defendants*

James P. Rouhandeh<br>
Charles S. Duggan<br>
Andrew Ditchfield<br>
DAVIS POLK & WARDWELL LLP<br>
450 Lexington Avenue<br>
New York, NY 10017<br>
Telephone: (212) 450-4000<br>
Facsimile: (212) 701-5800

*Attorneys for Underwriter Defendants*